**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Roger W. NELSON, Defendant–Appellant.**

Nos. 87–1628, 87–1821.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 15, 1988.

Decided July 12, 1988.

Rehearing Denied Aug. 12, 1988.

Aldo E. Botti, Botti Marinaccio DeSalvo & Peiper, Ltd., Oak Brook, Ill., for defendant-appellant.

Stephen P. Sinnott, Asst. U.S. Atty., Anton Valukas, U.S. Atty., Chicago, Ill., for plaintiff-appellee.

Before CUMMINGS, EASTERBROOK and MANION, Circuit Judges.

CUMMINGS, Circuit Judge.

In March 1987, Roger Nelson entered a conditional guilty plea to charges that from 1976 to 1984 he engaged in a continuing criminal enterprise ("CCE") in violation of 21 U.S.C. § 848.[1] The condition agreed to by the government was that Nelson would be allowed to appeal the ruling of the district court denying his motion to dismiss the CCE indictment. In addition to exercising the agreed condition, this appeal argues for specific performance of an asserted plea agreement and challenges the extent of the forfeiture order entered by the district court in imposing sentence on the conditional plea. We affirm the denial of both the motion to dismiss the indictment and the motion to enforce the plea agreement, and we also uphold the forfeiture order.

I

Nelson contends that his indictment should be dismissed because the government agreed to grant him immunity. Whether such an agreement exists is a matter of fact and the district court's finding will not be reversed unless it is clearly erroneous. See *United States v. Weiss*, 599 F.2d 730, 736 (5th Cir.1979); *United States v. Calimano*, 576 F.2d 637, 640 (5th Cir.1978). In Nelson's case, the district court carefully considered the conflicting testimony of Nelson and the Drug Enforcement Administration ("DEA") agents and, crediting part of Nelson's version, found that some kind of agreement existed but that it did not promise immunity. Neither of these findings is clearly erroneous.

The complicated facts behind the relationship between Nelson and the DEA in Miami, Florida, involve prominent figures, undercover activity, an island location, large amounts of drugs, money and violence and a videotape of the action, and resemble an episode of a television serial. These facts, however, are largely unrelated to the primary question of whether the DEA agents promised Nelson immunity. The relevant facts are as follows.

In the summer of 1985, Nelson knew that the U.S. Attorney's office in Chicago, working with the Chicago offices of the DEA and the Internal Revenue Service ("IRS"), was preparing to indict him for income tax violations and a CCE offense based on his alleged drug-smuggling activities in the Bahamas, Florida and Illinois. A grand jury had been considering these charges and Nelson's attorney, Aldo Botti, who had been in contact with the U.S. Attorney's office, knew that a Northern District of Illinois indictment was imminent.

Also in the summer of 1985, F. Lee Bailey of the Massachusetts Bar worked with the Miami DEA to put together a group, later called the Cistern 5, to do undercover investigatory work for the DEA concerning drug-smuggling activities on Cistern Cay in the Bahamas. Nelson was recruited for this group and on August 28, 1985, he and the other members of Cistern 5 met with DEA representatives in Miami to discuss a deal. No promises were made at that meeting, but Nelson did indicate that in return for his cooperation he wanted unindicted co-conspirator status, incorrectly terming it "what [former President] Nixon got." Two days later, the U.S. Attorney's office in Chicago, which had been alerted to Nelson's offer of cooperation with the DEA in Miami, wrote to the U.S. Attorney's office in Miami insisting that no deals could be made with Nelson without the prior approval of the Chicago U.S. Attorney's office.

On September 4, 1985, the members of Cistern 5 met again with the DEA in Miami. Present on behalf of the DEA were agents Billbrough, Chellino and Frankhar; Billbrough and Chellino were the second and third top-ranking officials in the Miami office of the DEA. According to Nelson's testimony, Chellino told the group at the outset that the DEA could not promise them anything except that "at the proper

---

1. Nelson was sentenced to ten years' imprisonment on his CCE conviction. He also pled guilty to a charge of filing a false income tax return in violation of 26 U.S.C. § 7206(1), but he does not appeal with respect to that plea or the three-year concurrent sentence imposed.

time the proper people will know what you have done, and any judge would be a fool not to listen to what we have to say." To which Nelson says he responded, "we are not going to go back there and risk our lives, our family, our property and our future for nothing.... We would have to be fools." Nelson further testified that following this exchange the meeting degenerated into a heated argument with members of the group stating that they would pull out. According to Nelson, the argument ended when Chellino stated "All right. You give me three, three [meaning substantial drug seizures] and this man [pointing to Sam Billbrough, who had been introduced as the second most powerful man in the United States DEA] will go directly to Washington, bypass Chicago, and take care of your problems." Contrary to Nelson's testimony, neither Chellino nor Frankhar recalled any statements concerning bypassing Chicago. After weighing the credibility of the witnesses and the evidence, the district court credited some of Nelson's version and concluded that Chellino did in fact tell Nelson that in return for three seizures DEA Miami would go to Washington on his behalf.

The district court did not, however, find that Chellino's promise to intecede for Nelson in Washington either constituted a grant of immunity or was understood by Nelson as such. In reaching this conclusion, the court took into account the testimony and credibility of the witnesses as well as the position of the parties and their prior and subsequent actions. Specifically, the court considered that although under different circumstances a potential criminal defendant might believe that Chellino had promised him immunity, Nelson was too well informed and too well represented to be misled. At the time of the September 4th meeting Nelson was familiar with the procedures under which he would be indicted and had been advised both by F. Lee Bailey[2] and the U.S. Attorney's office in Chicago that no settlement could be made without Chicago's approval. The court also noted that during subsequent meetings with the DEA and U.S. Attorney's office in Chicago, Nelson never claimed that he had been granted immunity by Miami DEA, but instead began the Chicago negotiations with a request that he not receive any jail time and later even agreed to accept a substantial jail sentence.

In light of these considerations, the district court's finding "that Nelson bargained for and received an agreement by the DEA not for immunity but for a spokesman who would go to the highest levels to make his operation known and to make favorable recommendations concerning what charges, if any, were brought against him" is not clearly erroneous. Finally, because we affirm the district court's finding that Miami DEA did not promise Nelson immunity, there is no need to consider what effect, if any, such an unauthorized promise would have had. See *Weiss*, 599 F.2d at 735 n. 9.

## II

Nelson also argues that if his immunity position is not accepted, we should enforce the plea agreement "promised" by the U.S. Attorney's office in Chicago. This alternative argument fails for the same reason as the first—no such promise exists. The U.S. Attorney's January 8, 1986, letter upon which Nelson relies is not a plea agreement but only a conditional offer to enter into a written plea agreement. The letter states what provisions the plea agreement "would" include and that "[b]efore the government would be willing to enter into the written plea agreement with your client we would require a completely truthful proffer from your client." The letter further states that the "U.S. Attorney will be the sole judge of the sufficiency and truthfulness of [Nelson's] disclosures concerning his assets" and that if he determined that Nelson is "not being totally truthful or cooperative, the proffer will be terminated." The U.S. Attorney subsequently found that Nelson was not being truthful and cooperative but that instead was manipulating his assets to avoid forfeiture. Therefore, a February 25, 1986, letter to Nelson's attorney stated:

2. Bailey was not Nelson's attorney but was representing his own Bahamian interests.

"This letter is to inform you that it has come to our attention that your client is disposing of and disguising his various assets. Because of this, our plea agreement offer to your client is hereby withdrawn, as he has not been acting in good faith." The U.S. Attorney was within his rights when he withdrew the January 8th conditional offer to make a written plea agreement. No written agreement was ever made; therefore none exists to enforce.

### III

Nelson challenges two portions of the forfeiture order entered by the district court under 21 U.S.C. § 848. The first ordered him "to pay $1,865,820.00 minus $25,800.00 (the value of 40 100–oz. Silver Bars)[3] in gold, silver or United States Currency to the United States," and the second ordered him "to forfeit and transfer to the United States title to the Air Charter Building and [airport] land located on Route 34, Sandwich, Illinois." As to the forfeiture of the Air Charter land and hangar, Nelson contends that the government failed to meet its burden of proving by a preponderance of the evidence that he used illegal funds to purchase them. As to the $1,865,-820, Nelson contends that since he has already forfeited all of the gold and silver currently in his possession, he should not be required to forfeit additional assets to satisfy what he labels a deficiency judgment. Both contentions fail.

■ The Comprehensive Forfeiture Act of 1984 ("CFA"), Chapter III of the Comprehensive Crime Control Act of 1984 ("CCCA"), amended the criminal forfeiture provisions of both the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961–1968, and the CCE statute, 21 U.S.C. § 848, under which Nelson pled guilty. The amended version of the forfeiture provisions of the CCE Act provides for a rebuttable presumption that alleviates the government's evidentiary burden in establishing that a defendant obtained property as a result of criminal conduct if the government establishes by a preponderance of the evidence both that the property was acquired during the period of the violation and that there was no likely source for the purchase money other than the drug violation. 21 U.S.C. § 853(d). See Reed, *Criminal Forfeiture Under the Comprehensive Forfeiture Act of 1984: Raising the Stakes*, 22 Am.Crim. L.Rev. 747, 759–760 (1985). In Nelson's case, however, the amendment came too late to apply and therefore the government cannot rely upon a presumption of forfeitability. However, the unavailability of the presumption does not mean, as Nelson asserts, that the government must trace the specific funds spent to purchase the Air Charter land and hangar. The government can rely on something very similar to the presumption, the net worth theory.

The net worth theory compares legitimate income to expenditures and, in the absence of any explanation by the defendant which is reasonably susceptible of being checked, presumes that excess expenditures are from illegitimate sources. The government has long relied on this theory in tax evasion cases to demonstrate that a taxpayer's expenditures in a given period exceed his legitimate or reported income, see, *e.g., Capone v. United States*, 51 F.2d 609 (7th Cir.1931), certiorari denied, 284 U.S. 669, 52 S.Ct. 44, 76 L.Ed. 566, and, in that context, the Supreme Court has explicitly approved its use. *Holland v. United States*, 348 U.S. 121, 137–138, 75 S.Ct. 127, 136–37, 99 L.Ed. 150 (1954). More recently the Eighth Circuit upheld the use of the net worth theory in determining what property would be forfeited under the pre-amendment version of CCE Section 848. *United States v. Lewis*, 759 F.2d 1316, 1327–1328 (8th Cir.1985), certiorari denied, 474 U.S. 994, 106 S.Ct. 406, 88 L.Ed.2d 357. We agree with *Lewis* and hold that the district court properly used the net worth theory in Nelson's case.

■ Using this theory, the district judge was clearly justified in concluding that the Air Charter land and hangar were

---

**3.** The district court allowed Nelson to deduct this amount because the government's witnesses, Nelson's co-conspirators, testified that he had disbursed it to them.

purchased with profits from Nelson's drug-smuggling operations. In a net worth analysis, the government is not required to present direct evidence of the specific source of money for any specific expenditure; proof of a likely source is sufficient. *United States v. Mackey*, 345 F.2d 499, 507 (7th Cir.1965), certiorari denied, 382 U.S. 824, 86 S.Ct. 54, 15 L.Ed. 2d 69 (income tax case). Helene Seltzer, an agent with the Criminal Investigation Division of the IRS, testified that in 1982 Nelson purchased land for the Air Charter building at the Sandwich Airport for $30,000 and later in 1982 paid $44,870.25 for the hangar. Other evidence introduced at trial by the government established both that Nelson's known expenditures for 1982, the year in which he purchased Air Charter, exceeded his legitimate income by almost $200,000 and that his drug-smuggling operations that year yielded huge cash profits. On the basis of this evidence the district court was justified in its "finding that Mr. Nelson's money from his smuggling activities went into gold and silver and into his airport facility, and ... [in Nelson's favor that] the evidence was sufficient to show he could have his house and his mortgage payments and these three other airplanes without buying them from his ill-gotten gains." Although we uphold both the use of a net worth theory in determining forfeitable property under then Section 848 and its application in this case, the forfeiture of the Air Charter land and building could also be upheld under the district court's additional finding that the property was "used repeatedly in the course of the conspiracy for improper purposes."

■ Finally, Nelson attacks the portion of the forfeiture judgment that requires him to pay $1,840,020 in gold, silver or United States currency to the United States. He argues that since he turned over all of the gold and silver in his possession at the time of the forfeiture order (920 one-ounce gold Krugerrands, 780 100–ounce silver bars, 19,049 silver dimes, 2,190 silver half-dollars and 3 Canadian maple leafs), this should satisfy the judgment and he should not be liable for the approximately $850,000 difference between the value of the property he forfeited and the amount of the judgment against him. Nelson reasons that he should not be required to forfeit assets that have no proven connection with his illegal enterprise.

Nelson's argument fails because he relies on establishing a connection between the forfeitable property and his drug-smuggling activities at the wrong stage of the proceedings. Although the connection is vital in determining the defendant's liability, "[t]he government's right to forfeit the profits of proceeds of [drug activity is] ... not limited to whatever is left over or unspent at the time of conviction, but instead includes the entire amount that was acquired by the defendant in violation of [the CCE] statute." *United States v. Ginsburg*, 773 F.2d 798, 801 (7th Cir.1985), certiorari denied, 475 U.S. 1011, 106 S.Ct. 1186, 89 L.Ed. 2d 302 (under RICO, 18 U.S.C. § 1963(a)(1), rejecting the same argument that the government's interest is limited to whatever ill-gotten property the defendant still has in his possession at the time of conviction or that the government bears the burden of tracing the property sought).

The connection between assets and illegal enterprise for which Nelson argues might be appropriate if the forfeiture proceeding was *in rem*, but it is not, it is *in personam*. Like the forfeiture penalty in RICO at issue in *Ginsburg*, the forfeiture penalty incorporated in CCE Section 848 differs from civil forfeiture provisions in other federal statutes. Under the civil forfeiture statutes, the forfeiture proceeding is *in rem* against the property, and, since the property being forfeited is itself considered the offender, the forfeiture is not part of the punishment for the criminal offense. Under CCE Section 848, however, the forfeiture is part of the criminal penalty against the individual. The proceeding is *in personam* against the defendant and the forfeiture is part of the punishment. See *Ginsburg*, 773 F.2d at 800; *United States v. L'Hoste*, 609 F.2d 796, 813 n. 15 (5th Cir.1980), certiorari denied, 449 U.S. 883, 101 S.Ct. 104, 66 L.Ed. 2d 39; *Reed, supra*, at 747–748. Nelson therefore must

forfeit the total amount of the proceeds of his smuggling activity, regardless of whether the specific dollars received from that activity are still in his possession.

The April 3, 1987 forfeiture judgment and the May 22, 1987 judgment of conviction are both affirmed.