**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Gregory J. EDWARDS, Defendant–Appellant.**

**No. 88–3286.**

United States Court of Appeals, Seventh Circuit.

Argued May 17, 1989.

Decided Sept. 20, 1989.

Jeffrey Anderson and Mark A. Cameli, Asst. U.S. Attys., Office of the U.S. Atty., Madison, Wis., for the U.S., plaintiff-appellee.

Gregory J. Edwards, Metropolitan Correctional Center, Chicago, Ill., pro se. and Morris D. Berman, Giesen & Berman, Madison, Wis., for Gregory J. Edwards, defendant-appellant.

Before WOOD, Jr. and POSNER, Circuit Judges, and ESCHBACH, Senior Circuit Judge.

HARLINGTON WOOD, Jr., Circuit Judge.

Gregory Edwards pleaded guilty to one count of possession of cocaine with intent to distribute. *See* 21 U.S.C. § 841(a)(1). As part of his negotiated plea agreement with the government, Edwards reserved the right to appeal the district court's denial of several pretrial motions to suppress. We now review those rulings.

## I. FACTUAL BACKGROUND

As do many drug investigation squads, the Dane County, Wisconsin, Metro Narcotics and Vice Unit ("Metro") relies heavily upon tips provided by confidential informants. On April 9, 1988, an anonymous informant, MPD 917, contacted Metro Detective David Mahoney. MPD 917 told Detective Mahoney that someone named "Greg" was going to sell a kilo of cocaine to one Steven Kreger, from whom MPD 917 had admitted buying cocaine in the past. According to MPD 917, "Greg" was Kreger's supplier and was from the Lake Wisconsin area. The planned transaction was to take place in the East Towne Mall area in Madison, Wisconsin around 7:00 p.m. that night. Kreger would be driving a red 1977 Camaro.

Detective Mahoney testified at Edwards' suppression hearing that based on past experience with this informant he believed the tip to be reliable. Since January 1988, when MPD 917 had been arrested on state felony charges of cocaine possession, MPD 917 had provided corroborated information to Detective Mahoney on 12 occasions.[1] Detective Mahoney received information from MPD 917 in March 1988 that Kreger was involved in cocaine distribution from his residence in Sun Prairie. MPD 917 claimed to have been present when distributions and ingestion of cocaine had occurred. This information was corroborated by a controlled buy of cocaine from Kreger by MPD 917, although Detective Mahoney admitted that he did not observe the buy.

Based on MPD 917's tip, Detective Mahoney and other Metro officers converged on the East Towne Mall parking lot around 6:45 p.m. on April 9. Detective Mahoney and Detective Richard Pharo stationed themselves in the mall's parking lot, while Detective Allen Rickey set up a surveil-

---

1. MPD 917 apparently hoped that cooperation with the police would help with his/her own legal problems—MPD 917 faced a possible ten-year sentence on the possession charge. Although Detective Mahoney made no specific promises, he did indicate that he would do what he could depending upon the quality of information MPD 917 provided.

lance position in a nearby bank parking lot. Detective Mahoney stated that it took some time for him to locate the Camaro and that once he did he returned to the front area of the mall where Detective Pharo was stationed. The two of them then returned to where the Camaro was parked. A Chevrolet Blazer was now parked next to the passenger side of the Camaro. Detective Mahoney parked behind and to the right of the Blazer, while Detective Pharo selected a space some 75 to 100 feet away. Detective Mahoney saw a woman sitting in the passenger seat of the Blazer; from his vantage point, Detective Pharo saw someone behind the wheel of the Camaro, but could not see anyone in the Blazer. Detective Mahoney watched the two vehicles for 5 to 10 minutes. Finally he saw a man standing between the Blazer and the Camaro who later entered the driver's side of the Blazer. He could not tell where the man came from, nor did either detective see anything in the man's hands. Shortly thereafter, the Blazer left the parking lot, as did the Camaro. The cars turned in opposite directions as they left the mall, the Blazer heading west onto East Washington Avenue toward Madison.

Detective Mahoney ran a license check on the Blazer and discovered that it was registered to Gregory Edwards at a McFarland, Wisconsin address.[2] Detective Mahoney attempted to radio this information to the other Metro officers but did not recall who received the information. The Metro's radio system was malfunctioning that evening, and only a fraction of all transmissions was being received. Mahoney transmitted a message to the effect that the "meet had taken place," but he gave no orders to stop either the Camaro or the Blazer. Detectives Pharo and Rickey followed the Blazer after it left the mall parking lot. Neither detective received Detective Mahoney's message about the Blazer's registration, although Detective Rickey did hear Detective Mahoney's statement about the "meet" taking place.

The two detectives followed the Blazer until it entered the parking lot of Lewis' Prime Rib Restaurant. Detective Pharo stopped in front of the Blazer; Detective Rickey stopped behind it. Detective Pharo testified that because of this arrangement, it would have been difficult for the Blazer to leave. Both detectives left their cars and approached the Blazer with badges displayed and guns drawn. Detective Pharo testified that he pointed his gun at the Blazer's windshield and ordered the driver, later identified as Edwards, and the passenger, Ms. Kris Neitz, to put their hands on the dash. Detective Rickey, also approaching, issued the same order. Detective Pharo then came around to the driver's side, removed Edwards from the Blazer and immediately handcuffed him. Neitz was also taken from the vehicle and handcuffed. Detective Rickey tried to open the center console of the Blazer but failed. The detectives searched Edwards for weapons and contraband but found nothing. Detective Rickey asked Edwards if he had a gun. Edwards replied, "What do I need a gun for," and stated that he was just there to have dinner.

Detective Rickey next asked for their names and residences. He also asked Edwards where he worked. No *Miranda* warnings preceded these questions. Edwards told the detectives that he lived in Poynette, Wisconsin and was employed by Success Marketing. Detective Pharo managed to open the console that earlier had confounded Detective Rickey. Inside he found a cardboard box containing a large amount of United States currency. Squad cars were then called to the scene and Edwards and Neitz were taken to the police station. The Blazer was driven to the Madison police station where it was impounded and its contents later seized.

Once at the station house, Detective Pharo read Edwards his constitutional rights from a *Miranda* card provided by the police department. Edwards indicated that he wished to contact his attorney, Mr. Lehman. Although Detective Pharo tried to

---

**2.** McFarland is a suburb southeast of Madison and is not in the Lake Wisconsin area. The magistrate presiding at the suppression hearing took judicial notice of McFarland's location.

assist Edwards by offering him a telephone book, he either could not find one or Edwards could not locate Mr. Lehman's home number in it. Edwards indicated that he could simply call his business partner, Curt, to obtain Mr. Lehman's number. This request was refused.

In the early morning hours of April 10, the detectives obtained and executed a search warrant issued for Edwards's home. The warrant was based on an affidavit that recited that money had been found in the Blazer and that Edwards had been driving it. The warrant was also issued in reliance upon statements made by Kreger and the recovery of cocaine from his Camaro. The warrant authorized a search for cocaine and drug paraphernalia, currency and documents tending to identify the occupants of the residence. Detective Pharo testified that he ordered the agent in charge of collecting the sought items to seize anything that showed monetary amounts, such as receipts or appraisal documents, but that the agent may have seized items beyond the scope Detective Pharo ordered. Detective Pharo theorized, in ordering the seizure of such documents, that these sorts of items, showing expenditures or other amounts, were evidence of drug dealing because drug dealers often had large amounts of cash. One of the agents assisting in the search, Deputy Cross, testified that he was never instructed about the scope of the warrant. He believed they were searching for items to be disclosed to the Internal Revenue Service. In addition to taking these documents, the officers searching Edwards's home took photographs of every room in the house and its contents, which included jewelry, guns and other valuables.

Less than a week later, the magistrate issued a forfeiture warrant under 21 U.S.C. § 881(b). The warrant authorized the search and seizure for forfeiture of Edwards's Poynette home and all of his personal property, including all vehicles and boats.

## II. DISCUSSION

Edwards filed numerous motions to suppress. The magistrate recommended that all these motions be rejected; the district court adopted the magistrate's recommendation. On appeal, Edwards alleges that his warrantless arrest was unlawful because the detectives had no probable cause to arrest him outside the restaurant. He further contends that because the arresting officers had no probable cause to arrest him, the search of the Blazer incident to that arrest was unlawful and its results should have been suppressed. He also argues that the statements he made to the officers in the parking lot of the restaurant, as well as those he made at the police station, should have been suppressed because they were a product of the unlawful arrest. Furthermore, Edwards argues that the statement he made at the station house about calling his partner to get his attorney's phone number should be suppressed as obtained in violation of his fifth amendment right to counsel. Finally, Edwards contends that both the search warrant and the forfeiture warrant were unlawful—the search warrant because it was obtained through information arising from the constitutionally flawed arrest and because it was overbroad in its execution, and the forfeiture warrant because it was tainted by the unlawful arrest and the unlawful search warrant. We address each of these issues in turn.

### A. The Warrantless Arrest [3]

Edwards contends that the Metro detectives who arrested him did not have proba-

---

**3.** It appears that the government originally argued that the initial stop of Edwards was a mere *Terry*-type investigative stop that subsequently matured into a full-blown, warrantless arrest. The magistrate found that the stop was a full custodial arrest from its inception. "The physical blockage of defendant's course, the shouted commands, the unambiguous display of weapons and the almost immediate application of

handcuffs would have left no doubt in a reasonable mind that he or she was not free to leave." *United States v. Edwards*, No. 88-C-48-C, slip op. at 10 (W.D.Wis. July 23, 1988) (Magistrate's Report and Recommendation). This finding was adopted by the district judge. *See Edwards*, No. 88-C-48-C, slip op. (W.D.Wis. Aug. 9, 1988) (Order denying defendant's objections to Magistrate's Report and Recommendation). The

ble cause for the warrantless arrest because, according to Edwards, the facts and circumstances known to Detectives Pharo and Rickey at the time of the arrest were insufficient to establish probable cause. Apparently neither of the two detectives knew anything about MPD 917 other than the substance of the tip. Detective Pharo stated that, from where he was stationed in the mall parking lot, he had not seen anyone enter or leave the Blazer. Moreover, Detective Rickey had not even seen the two vehicles because he was not in the East Towne Mall parking lot. They therefore had no basis upon which to consider the tip reliable according to Edwards. Further, both Detective Pharo and Detective Rickey testified that they did not hear the registration information concerning the Blazer that was transmitted by Detective Mahoney. They therefore did not know that the vehicle was registered to Gregory Edwards when they decided to stop it. The only additional information the two had was the message, which only Detective Rickey received from Detective Mahoney, that "the meet went down." Detective Mahoney admitted that while he had observed a man standing between Kreger's Camaro and the Blazer who later entered the Blazer on the driver's side, he did not see anything pass into or from the Camaro, nor did he see anything in the hands of the man who entered the Blazer. Therefore, according to Edwards, Detectives Pharo and Rickey had neither "objective facts communicated to them, nor the first hand knowledge of facts to warrant the stop of the Blazer and the arrest of the occupants."

■ The government responds that Detectives Pharo and Rickey did have sufficient grounds to arrest Edwards. Initially the government argues that it was unnecessary for the detectives to have personal knowledge of MPD 917's reliability; they were entitled to rely upon Detective Mahoney's knowledge of the informant's reliability. "[W]e do mutually impute the knowl-

edge of all the agents working together on the scene and in communication with each other." *United States v. Woods,* 544 F.2d 242, 260 (6th Cir.1976), *cert. denied,* 429 U.S. 1062, 97 S.Ct. 787, 50 L.Ed.2d 778, 430 U.S. 969, 97 S.Ct. 1652, 52 L.Ed.2d 361, 431 U.S. 954, 97 S.Ct. 2675, 53 L.Ed.2d 270 (1977). We agree with the government that Detective Mahoney had a reasonable basis to believe that MPD 917 was reliable, and because Detectives Pharo and Rickey knew about MPD 917 and the tip given, Detective Mahoney's reasonable reliance upon MPD 917 may be imputed to the other detectives.

■ Furthermore, according to the government, the tip's reliability was borne out by other circumstances—the appearance, at the time, place and date given by MPD 917, of Kreger's 1977 Camaro in the East Towne Mall parking lot, parked face out and with its headlights on while it was still light out (as if to signal a supplier and also allow for a quick getaway if necessary, according to the government); that the Blazer parked next to Kreger's Camaro was registered to a "Greg"; and the presence of a man standing between the two vehicles who then entered the driver's side of the Blazer. These last two details, however, were known only to Detective Mahoney, who never managed to communicate these facts (including the fact that the owner's first name was Greg) to either Detective Pharo or Detective Rickey. We do not, therefore, believe this information can be included in the imputed knowledge the arresting detectives possessed when they decided to stop and arrest Edwards. A supervising officer's knowledge about a defendant cannot be relied upon to provide probable cause for his arrest where there is no evidence that such knowledge was communicated to the agents on the scene who actually made or ordered the defendant's arrest. *Woods,* 544 F.2d at 259. Detective Mahoney's knowledge that "the meet went down," however, can be imputed to Detective Rickey because he received Detective

government does not challenge that finding before this court; therefore we do no *Terry* analysis of the stop, but rather presume that the seizure of Edwards in the restaurant parking lot

was a custodial arrest *ab initio,* and proceed directly into an analysis of whether the detectives had probable cause to arrest Edwards.

Mahoney's transmission. Detective Rickey's knowledge can then be imputed to Detective Pharo because they made the arrest together. *See Woods,* 544 F.2d at 260.

Finally, the government argues that Detective Pharo and Rickey could have arrested Edwards based upon what was known to each of them individually, even though neither of them had personal knowledge that a crime had been committed. "Probable cause requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." *United States v. Lima,* 819 F.2d 687, 688 (7th Cir.1987). We need not decide whether either Detective Pharo or Detective Rickey had sufficient knowledge alone to arrest Edwards because the concept of imputed knowledge means that Detectives Pharo and Rickey could rely upon the information they possessed as a team in executing the arrest of Edwards. We agree with the magistrate and the district court judge that Detectives Pharo and Rickey had sufficient knowledge between them to constitute probable cause to arrest him.

### B. Search Incident to the Arrest

 Edwards contends that the search the detectives made of the Blazer after his arrest was unlawful because the arrest was unlawful. It is true that a search and seizure incident to an arrest must be incident to a lawful arrest. *United States v. Janik,* 723 F.2d 537, 548–49 (7th Cir.1983). But where an arrest is lawful, police officers may make a warrantless search incident to that arrest of the arrestee's person and the immediate area in order to secure any weapons or prevent the destruction of evidence. *Chimel v. California,* 395 U.S. 752, 762–63, 89 S.Ct. 2034, 2039–40, 23 L.Ed.2d 685 (1969); *United States v. Arango,* 879 F.2d 1501, 1504 (7th Cir.1989). In the present case, we have already held that Edwards's arrest was lawful, therefore the search of the Blazer incident to that arrest was also lawful so long as it did not exceed the scope permitted for such searches. Only a limited search may be made incident to an arrest. *Chimel,* 395 U.S. at 763, 89 S.Ct. at 2040; *United States v. Queen,* 847

F.2d 346, 352 (7th Cir.1988). Such a search will be upheld as lawful where it "was contemporaneous with the arrest, was conducted to prevent seizure of a weapon or destruction of evidence, and was limited to the area within the arrestee's immediate control." *Queen,* 847 F.2d at 352. As noted by the magistrate, when an automobile or other vehicle is searched incident to an arrest, the area within which the officers may search includes not only the passenger compartment but also containers within that compartment.

> [W]hen a policeman has made a lawful custodial arrest of the occupant of an automobile, he may, as a contemporaneous incident of that arrest, search the passenger compartment of that automobile.

> It follows from this conclusion that the police may also examine the contents of any containers found within the passenger compartment, for if the passenger compartment is within reach of the arrestee, so also will containers in it be within his reach.

*New York v. Belton,* 453 U.S. 454, 460, 101 S.Ct. 2860, 2864, 69 L.Ed.2d 768 (1981). The Blazer's console and the box found inside fall within the meaning of "container." *Id.* at 460–61 n. 4, 101 S.Ct. at 2864 n. 4.

The detectives' search of Edwards's person and vehicle comported with these standards. Immediately after ordering Edwards out of the Blazer, Detective Pharo performed a full pat down search before placing him in handcuffs. Detective Rickey then tried unsuccessfully to open the console located between the driver and passenger seats in the Blazer and asked Edwards if he had a gun with him; Detective Pharo's attempts were more successful and the detectives located the large amount of money that Edwards later endeavored to suppress. Detective Rickey's first question to Edwards as he opened the driver's side door of the Blazer was whether Edwards had a gun. All of the detectives' actions were consistent with the legitimate purposes of a search incident to an arrest— to prevent the arrested individual from lay-

ing hands upon a weapon and to prevent the destruction of evidence. Moreover, the search went no farther than necessary to achieve these goals. The detectives' search of Edwards's vehicle was therefore lawful and the district court properly denied Edwards's motion to suppress the results of the search.

### C. Statements Made at the Time of Arrest

Edwards made several statements when he was arrested before receiving *Miranda* warnings. When he approached Edwards, after having identified himself and while pointing a gun at Edwards, Detective Rickey asked Edwards if he had a gun and Edwards responded, "What do I need a gun for? We just came for dinner." Edwards also provided the detectives his name, address and place of employment upon request. Edwards wanted these statements suppressed but the district judge, following the magistrate's recommendation, refused.

On appeal Edwards argues first that the statements should have been suppressed because they were obtained in the context of an illegal arrest. If statements are obtained through exploitation of an illegal arrest, they will be suppressed. *Brown v. Illinois*, 422 U.S. 590, 604, 95 S.Ct. 2254, 2262, 45 L.Ed.2d 416 (1975); *Dunaway v. New York*, 442 U.S. 200, 217, 99 S.Ct. 2248, 2259, 60 L.Ed.2d 824 (1979). Edwards's arrest was not illegal, however, so this argument may be summarily rejected.

Edwards also contests the admission of his statements on the grounds that he made them in response to questions asked before the detectives gave him *Mi-*

*randa* warnings. *Miranda* warnings are to be given prior to custodial interrogations. *See Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). There is no question that Edwards was in custody when he was questioned; this however does not end the inquiry.

First, there are exceptions to *Miranda*'s seemingly absolute rule. The interchange between Detective Rickey and Edwards concerning whether Edwards had a gun falls within the public safety exception to *Miranda* established in *New York v. Quarles*, 467 U.S. 649, 655–57, 104 S.Ct. 2626, 2631–32, 81 L.Ed.2d 550 (1984) (defendant's statement concerning gun's location would not be suppressed merely because police officer asked where gun was before giving *Miranda* warnings to defendant). *See also United States v. Brady*, 819 F.2d 884 (9th Cir.1987), *cert. denied*, — U.S. ——, 108 S.Ct. 1032, 98 L.Ed.2d 996 (1988) (questioning defendant about whether he had a gun in his car covered by *Quarles* public-safety exception to *Miranda*). As the magistrate noted, drug dealers are known to arm themselves, particularly when making a sale, in order to protect themselves, their goods and the large quantities of cash often associated with such transactions. It was therefore appropriate for Detective Rickey to determine whether Edwards had a weapon that might pose a threat to him, Detective Pharo and innocent persons in the area.[4]

The detectives' questions concerning Edwards's identity, residence and place of employment are somewhat more problematic. The magistrate found that these questions were not a violation of *Miranda*, on the basis that the information would

**4.** Moreover, *Quarles* apparently does not require that a court inquire into the subjective motivation of the police officer who questions an arrestee about the possession of a gun. *See* 467 U.S. at 656, 104 S.Ct. at 2631–32. The Court noted, however, that its decision in *Quarles* was not to be construed as inconsistent with its holding in *Orozco v. Texas*, 394 U.S. 324, 89 S.Ct. 1095, 22 L.Ed.2d 311 (1969) (defendant's statements were properly suppressed where police awakened defendant in his room and questioned him about a gun used in a murder at a restaurant hours earlier). "[T]he questions

about the gun [in *Orozco*] were clearly investigatory" and "did not in any way relate to an objectively reasonable need to protect the police or the public from any immediate danger associated with the weapon." *Quarles*, 467 U.S. at 659 n. 8, 104 S.Ct. at 2633 n. 8. Because there was an objectively reasonable need to protect himself, his partner and the public (the arrest did take place in the parking lot of a restaurant) from the immediate danger that a weapon would pose, Detective Rickey's question and Edwards's answer fall within the rule of *Quarles* without running afoul of *Orozco*.

eventually have to be given during the booking process. He cited *Rhode Island v. Innis*, 446 U.S. 291, 302, 100 S.Ct. 1682, 1690, 64 L.Ed.2d 297 (1980), for the proposition that not all police questioning counts as interrogation, and *United States v. Kane*, 726 F.2d 344, 349 (7th Cir.1984), for the proposition that "a *Miranda* interrogation violation does not occur when arresting officers question a defendant only to a limited extent for data required as part of the processing normally attendant to arrest and custody."

*Innis* and *Kane* do not directly address the question at issue however. The defendant in *Innis* had been given his *Miranda* warnings upon being arrested for armed robbery. The defendant stated that he wished to speak with a lawyer and the police proceeded to the station without directly questioning the defendant further. The officers did, however, discuss among themselves in the defendant's presence the desirability of finding the shotgun that the defendant had used in the robbery as there was a school for handicapped children in the vicinity. The defendant spontaneously offered to, and later did, show the police where the gun was located. The Supreme Court held that the defendant had not been interrogated within the meaning of *Miranda* and sanctioned the use of the defendant's statements and actions against him, upholding his conviction.

In *Kane* the defendant was arrested on drug distribution charges, given the *Miranda* warnings, and placed in a holding room after he indicated he wished to talk to his wife. Upon a DEA agent asking him how he was doing, Kane responded, "By now you have checked me out and you know I am pretty big." Kane then explained to the agent that he gained his connections with Columbians and Cubans through his work as a boat mechanic. We held that Kane's responses were admissible against him at trial, citing *Innis*. "A *Miranda* interrogation violation does not occur when arresting officers question a defendant only to a limited extent for data required as part of the processing normally attendant to arrest and custody." *Kane*, 726 F.2d at 349.

Although in the instant case the defendant answered direct questions before being given any *Miranda* warnings, rather than making spontaneous remarks after receiving the warnings as in *Innis* and *Kane*, we believe that the reasoning of those two opinions is applicable here. In our opinion questions such as "what is your name?" and "where do you live?" will not usually constitute interrogation within the meaning of *Miranda*. In the first place, it cannot be said that the police, when asking such questions, "should know [that the questions are] probably likely to evoke an incriminating response from a suspect." *Innis*, 446 U.S. at 301, 100 S.Ct. at 1689–90 (explaining when police conduct or questioning will not amount to interrogation that implicates *Miranda*). This perspective is reinforced by the practical observation that police routinely ask people for their names and addresses in nonarrest situations—in order to ascertain the identity and residence of witnesses, as well as to dispel (or confirm) suspicions aroused by unusual behavior—where it is clear that *Miranda* warnings are not required, although such inquiries might in fact confirm a police officer's suspicions sufficiently to give rise to probable cause to arrest. *Cf. California v. Byers*, 402 U.S. 424, 91 S.Ct. 1535, 29 L.Ed.2d 9 (1971). Finally, as the magistrate noted, even in an arrest situation such questions will eventually be asked during booking and the "prevailing view is that routine inquiries during booking are lawful even absent the *Miranda* warnings." W. LaFave & J. Israel, 1 *Criminal Procedure* § 6.7(b), at 504 (1984) [hereinafter LaFave & Israel] (footnote omitted); *see also United States v. Monzon*, 869 F.2d 338, 342 (7th Cir.), *cert. denied*, —— U.S. ——, 109 S.Ct. 2087, 104 L.Ed.2d 650 (1989); *Kane*, 726 F.2d at 349. We note also that requiring a suspect to participate in other identification procedures, such as line-ups, or to provide nontestimonial evidence of identity, such as fingerprints, handwriting samples, and voice exemplars, does not violate the fifth amendment right against self-incrimination. *See United States v. Wade*, 388 U.S.

218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967) (line-up and voice sample); *Gilbert v. California*, 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967) (handwriting exemplar). *See generally*, La Fave & Israel, § 6.7(b), at 505; *id.* § 7.2(b), at 555–56. We therefore agree with the magistrate that questioning Edwards about his identity and residence before giving him the *Miranda* warnings did not violate his fifth amendment right against self-incrimination because those questions did not constitute interrogation under *Innis*.[5]

We similarly hold that questioning Edwards about his place of employment did not constitute interrogation because the officers could not reasonably have known that such a question was "probably likely to evoke an incriminating response." *Innis*, 446 U.S. at 301, 100 S.Ct. at 1690. We note, however, that we confine ourselves to the particular facts of this case in reaching this result and do not articulate any general rule that questioning defendants about their employment always falls outside the reach of *Miranda*. We hold merely that in this particular case the question passes the test of *Innis*. *Cf. Monzon*, 869 F.2d at 342 (asking an arrestee if he owns a car located at arrest scene does constitute interrogation under *Innis* and should not have been asked in absence of *Miranda* warnings).

### D. *Statements Made at the Police Station*

■ After being transported to the Madison police station, Edwards was placed in an interview room. Detective Pharo read Edwards the *Miranda* warnings and Edwards indicated that he wished to contact his attorney, Mr. Lehman. Detective Pharo apparently offered to get a phone book for Edwards to locate the attorney's number but he either could not find the book or Edwards could not find the number in the book. Edwards then asked if he could contact his business partner Curt and get

the number from him. Detective Pharo declined the request.[6]

Edwards claims that this interchange should have been suppressed on two grounds. First, he alleges that the statements were tainted by the illegal arrest and therefore could not be used against him. We may summarily reject this argument, as we have found that Edwards's arrest was indeed lawful, therefore the statements cannot be characterized as the fruit of an unlawful seizure. Second, Edwards argues that these statements were obtained in violation of his fifth amendment right to counsel which he had invoked and was attempting to exercise. Although his argument is less than clear, essentially Edwards contends that the police (when they read him his *Miranda* rights) indicated to him that he had a right to contact an attorney, that while he was attempting to exercise that right he made these statements, and that permitting the prosecution to offer those statements into evidence against him infringes upon the very right the detective assured Edwards that he had.

Edwards's argument has some basis. *See Dean v. Young*, 777 F.2d 1239 (7th Cir.1985), *cert. denied*, 475 U.S. 1142, 106 S.Ct. 1794, 90 L.Ed.2d 339 (1986). It is analogous to the long-accepted proposition that the state cannot tell a defendant of his right to remain silent and then turn his own silence against him at trial. Generally a prosecutor may not offer evidence and may not comment upon a defendant's decision to exercise his fifth amendment right against self-incrimination, at least where that right is invoked after hearing the *Miranda* rights. *See Doyle v. Ohio*, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976). The rule is not absolute however. *See, e.g., Jenkins v. Anderson*, 447 U.S. 231, 100 S.Ct. 2124, 65 L.Ed.2d 86 (1980) (not improper for prosecutor to impeach defendant with fact of defendant's pre-arrest silence); *Fletcher v. Weir*, 455 U.S. 603, 102 S.Ct. 1309, 71 L.Ed.2d 490 (1982) (not improper

---

**5.** This seems to be the prevailing view. *See* LaFave & Israel, *supra*, § 6.7(b), at 505.

**6.** Edwards also sought to suppress his home address, which he had given to the police during

booking. In light of our earlier discussion regarding *Miranda* and *Innis*, we reject this argument.

to impeach defendant with post-arrest but pre-*Miranda* warning silence). The rule in such cases comes down to this: "[T]he state may not first implicitly warn the defendant that silence will not be used against him and then accost him at trial once he remains silent." *Dean,* 777 F.2d at 1241. Similarly, permitting the prosecution to inform a jury that Edwards attempted to exercise his right to have counsel present before talking to the police arguably could have prejudiced him. *Cf. United States v. Lewis,* 651 F.2d 1163 (6th Cir.1981).

It is not clear, however, that the analogy between the two rights is all that strong. The prejudice flowing from a jury being told that a defendant has chosen to remain silent in the face of criminal accusations may be far more obvious than that flowing from informing them that the defendant wished to speak to a lawyer. The danger that a jury will infer guilt from evidence of a defendant's silence is fairly obvious, although it may be found harmless beyond a reasonable doubt in the end. *See, e.g., United States ex rel. Ross v. Fike,* 534 F.2d 731, 734 (7th Cir.1976). The same cannot be said about referring to the defendant's invocation of the right to counsel.

> [T]he inference [that the invocation of the right to counsel implies guilt] would not in any event be a logical one for a juror to draw in the absence of an invitation by judge or prosecutor.... "[T]he layman frequently views our criminal justice system as being confusing and complex, consultation with an attorney is not tantamount to an admission of involvement or guilt.... [T]here is no sound basis for inferring that petit jurors would view the use of professional assistance as an indication of criminality."

*Dean,* 777 F.2d at 1242–43 (quoting *United States v. Kopel,* 552 F.2d 1265, 1271 (7th Cir.), *cert. denied,* 434 U.S. 970, 98 S.Ct. 520, 54 L.Ed.2d 459 (1977)).

Moreover, Edwards's statement regarding his business partner is not clearly covered by the right-to-counsel label, for it was not an invocation of the right so much as a discourse on how he would like to proceed. In the course of his musings Ed-wards *volunteered* information about his business partner and his attorney; no interrogation was being pursued at the time. *Miranda* has never been held to apply to statements voluntarily made by defendants. If a defendant spontaneously volunteers information, either before or after being given the *Miranda* warnings, those statements need not be suppressed. *See Oregon v. Elstad,* 470 U.S. 298, 305, 105 S.Ct. 1285, 1291, 84 L.Ed.2d 222 (1985); *Innis,* 446 U.S. at 301–03, 100 S.Ct. at 1689–91; *Miranda,* 384 U.S. at 478, 86 S.Ct. at 1630. The district court therefore did not err when it refused to suppress the statements Edwards made at the police station about his business partner and attorney.

### E. Issuance and Execution of Search Warrant

Edwards challenges, on two grounds, the search warrant issued and executed to search his home. First, Edwards contends that the search warrant, and the evidence found through its execution, should have been suppressed as the fruit of an unlawful arrest and unlawful warrantless search. Second, he argues that even if the search warrant was lawfully issued, its execution was overbroad.

■ The search warrant was issued based upon the detectives' search of Edwards's Blazer, statements made by Kreger upon his arrest, and the results of a search of Kreger's Camaro (which turned up a kilo of cocaine). Edwards contends that all of this information was fruit of the poisonous tree (his unlawful arrest) and therefore could not be relied upon to obtain the search warrant for his home. Where the seizure is lawful, however, there is no poisonous tree. We have already held that the arrest of Edwards and the search of his vehicle incident to that arrest were lawful. To the extent that the arrest of Kreger, the search of his Camaro, and the statements he made to the police can be traced to the seizure of Edwards and the search of the Blazer, the police were justified in arresting Kreger and in searching Kreger's Camaro after discovering the money in Ed-

wards's Blazer. Moreover, although we need not resolve the question because of our holding that Edwards's arrest was lawful, the police undoubtedly had probable cause to seize Kreger and search his car even without the information gained through the arrest of Edwards, based simply upon the informant's tip and what the police saw in the mall parking lot.[7] The motion to suppress the search warrant and its results was therefore properly denied.

Edwards's overbreadth argument requires more discussion. The search warrant authorized a search for relatively specific items—papers that would identify the residents of the house, cocaine, drug paraphernalia, and currency. According to Edwards, the police who searched his home did not confine themselves to the parameters dictated by the warrant, but instead conducted a general search of the house. In particular Edwards objects to the fact that Detective Pharo, who supervised the search, told at least one member of the search team to look for documents that contained monetary information, on the theory that such documents would indicate drug dealing. Another officer testified at Edwards's suppression hearing that he was never told what the scope of the search was but that he had the impression that items were being taken for disclosure to the Internal Revenue Service. The search team found a set of scales, baggies containing cocaine residue, over $36,000 in currency, a number of weapons, and other valuable objects, including electronic equipment, jewelry, and art objects. They also discovered a tax return indicating that Edwards's reported income for 1987 was $21,-000 and pay stubs showing that Edwards earned a bi-weekly salary of $1500 in 1988. Other items, including receipts for the weapons and other property, appraisals on the jewelry and art, and papers concerning the purchase of the house were also found. According to the magistrate's report, these papers indicate that Edwards purchased or possessed items worth in excess of $213,-000 from 1985–88. In addition to seizing the items listed in the search warrant, the search team photographed the other objects in the house. These photographs were eventually used to obtain the forfeiture warrant discussed below.

The government concedes that the search conducted went beyond the scope of the warrant, but argues that the deviation was authorized by the plain view doctrine.

> An item [is] in plain view and seizable without a warrant if, (1) after a lawful initial intrusion affording the plain view of the contested item, and (2) an inadvertent discovery of the item, (3) "the incriminating nature of the evidence [is] immediately apparent" without information other than that which the executing officers properly possessed before their search was completed.

*United States v. Reed*, 726 F.2d 339, 343 (7th Cir.1984) (quoting *United States v. Schire*, 586 F.2d 15, 17, 19 (7th Cir.1978)). The government asserts that the initial intrusion was lawful and that the search team inadvertently discovered the various items in plain view while searching for items named in the warrant—namely the cocaine and the identification papers. Moreover, the prosecution contends that the incriminating nature of the items was quickly apparent. The officers were searching for drugs and drug paraphernalia in the home of a man whom they suspected of being a drug trafficker. The presence of so many valuable items and the large amount of cash, in conjunction with pay stubs and the income tax form indicating a level of income insufficient to sustain the obvious expenditures made by Edwards, gave these items found in Edwards's home an incriminating character.

■ We agree with the magistrate and the district court that the initial intrusion into Edwards's home was lawful. Furthermore, the items sought under the

---

7. Because Edwards alleges only that the information about Kreger, relied upon in obtaining the search warrant for Edwards' home, was the fruit of Edwards's allegedly unlawful arrest and not the fruit of some independent violation of

Kreger's constitutional rights, we need not address the issue of whether Edwards would even have standing to raise this latter issue as a grounds for suppression.

warrant are of a type easily concealed. The officers were entitled therefore to open drawers, closets, containers and other items that might conceal these items. *See United States v. Ross,* 456 U.S. 798, 820–21, 102 S.Ct. 2157, 2170–71, 72 L.Ed.2d 572 (1982). In the course of searching through such areas they discovered other sorts of incriminating items. These items, the jewelry, weapons, art objects and papers, are covered by the plain view doctrine because their incriminatory effect was immediately obvious. The wealth of Edwards, as judged by the possessions he kept in his home, and his reported income were completely out of line with one another. The magistrate determined that Detective Pharo, an experienced police officer who legitimately suspected Edwards of being a drug dealer, determined that Edwards's level of wealth was a proper subject for the search only after he saw exactly how much money Edwards must have. Edwards did not challenge this finding. He merely alleges that Detective Pharo took it upon himself to expand the scope of the warrant.

But this is the point of the plain view doctrine: where the police are lawfully searching a suspect's home or other area and inadvertently stumble onto evidence, in plain view, not known to exist at the time the warrant was issued, they are not required to turn a blind eye toward it, particularly where it is merely cumulative evidence of the crime already suspected. In *United States v. Reed,* for example, the search warrant authorized a search for cocaine and proof of residency. During the search the police discovered a bar of gold and firearms. We held that the police could reasonably have believed that these items were part of the suspected cocaine dealing operation. This type of logical nexus is all that is required. *Reed,* 726 F.2d at

343. As the magistrate noted, "the valuables and the receipts and appraisals [found in Edwards's home] were evidence of the profits of cocaine trafficking and the fruits of the currency, both subjects of the warrant. The police could also have reasonably believed that the weapons were involved in cocaine dealing." *United States v. Edwards,* No. 88–C–48–C, slip op. at 37 (W.D.Wis. July 23, 1988) (Magistrate's Report and Recommendation). We therefore agree that the execution of the search warrant was not overbroad and therefore it and the evidence discovered in its execution need not have been suppressed.

*F. Seizure Warrant*

■ Edwards contends that the seizure warrant for civil forfeiture, issued on April 15, 1988, authorizing the seizure of Edwards's home, vehicles, personal possessions and money, should have been suppressed on two grounds.[8] Initially, he argues that it was obtained as a result of his unlawful arrest and the unlawfully issued state search warrant. As we have already held that Edwards's arrest and the search warrant were in fact lawful, we summarily reject this argument. Edwards also argues, however, that the seizure warrant was facially overbroad and therefore should have been suppressed, but he focuses our attention primarily upon the items of personal property seized from his home under authority of the warrant. Edwards argues that the police failed to show that they had probable cause to believe that the seized items were traceable to drug trafficking and thus subject to forfeiture under 21 U.S.C. § 881(a)(6).[9]

Civil forfeiture proceedings may not be initiated on less than probable cause, but

---

8. For a discussion on some of the distinctions between civil and criminal forfeiture, see *United States v. Nelson,* 851 F.2d 976, 981–82 (7th Cir. 1988); *United States v. Moya–Gomez,* 860 F.2d 706, 721 (7th Cir.1988).

9. Section 881(a)(6) provides:
(a) The following shall be subject to forfeiture to the United States and no property right shall exist in them:
(6) All moneys, negotiable instruments, securities, or other things of value furnished or

intended to be furnished by any person in exchange for a controlled substance in violation of this subchapter, *all proceeds traceable to such an exchange,* and all moneys, negotiable instruments, and securities used or intended to be used to facilitate any violation of this subchapter, except that no property shall be forfeited under this paragraph, to the extent of the interest of the owner, by reason of any act or omission established by that owner to have been committed or omitted without the knowledge or consent of that owner.

the probable cause threshold in a drug forfeiture case is the same as that applicable elsewhere—there must be a reasonable ground for belief of guilt, supported by less than prima facie proof but more than mere suspicion. *United States v. $38,600 in U.S. Currency*, 784 F.2d 694 (5th Cir. 1986). Once the government has met its burden of proving that probable cause exists, the owner of the property bears the burden of refuting forfeitability by a preponderance of the evidence. *See United States v. Brock*, 747 F.2d 761, 762 (D.C.Cir. 1984) (per curiam).

The magistrate ruled that the government had carried its burden of proving that there was probable cause to seize Edwards's belongings as forfeitable. The magistrate noted that when Edwards's residence was searched on April 10, the police discovered drug paraphernalia including a set of sophisticated scales, baggies containing cocaine residue, notebooks with notations consistent with the recording of drug transactions, nearly $37,000 in cash, and a large number of weapons (including an Uzi). In addition to these items, the police had already seized $27,000 from Edwards's Blazer when he was arrested, Kreger had been caught with a kilo of cocaine immediately after leaving the meeting he and Edwards conducted in the parking lot, and Kreger and the confidential informant both gave information to the police that indicated that Edwards was not only a drug dealer but one having a fairly substantial operation. Moreover, in addition to finding the illicit items mentioned, the police searching Edwards' home turned up numerous valuable items, receipts for which indicated a value in excess of $200,000, and yet Edwards's income tax return and pay stubs indicated that Edwards had far too little legitimate income to account for such extravagance.

Based on all of these facts, the magistrate found that probable cause existed for the government to believe that all the items found in Edwards's home were subject to forfeit. We agree. A direct connection between the property subject to seizure and the illegal activity that renders the

21 U.S.C. § 881(a)(6) (emphasis added).

items forfeitable need not be shown in order to establish probable cause. Rather, probable cause analysis looks to the totality of the circumstances surrounding the situation. *Illinois v. Gates*, 462 U.S. 213, 230, 103 S.Ct. 2317, 2328, 76 L.Ed.2d 527 (1983). Furthermore, "probable cause requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." *Gates*, 462 U.S. at 244 n. 13, 103 S.Ct. at 2335 n. 13. Stated in terms applicable to the forfeiture context, where a defendant's verifiable income cannot possibly account for the level of wealth displayed and where there is strong evidence that the defendant is a drug trafficker, then there is probable cause to believe that the wealth is either a direct product of the illicit activity or that it is traceable to the activity as proceeds. *Cf. Brock*, 747 F.2d at 762. We hold, as did the magistrate, that the government had probable cause to seize Edwards's property and therefore the district court properly denied the motion to suppress the seizure warrant and the items obtained under it.

### III. CONCLUSION

For the reasons stated above the conviction of Gregory Edwards is AFFIRMED.