NONPRECEDENTIAL DISPOSITION
To be cited only in accordance with
Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Argued December 14, 2011
Decided January 20, 2012

*Before*

RICHARD A. POSNER, *Circuit Judge*

DANIEL A. MANION, *Circuit Judge*

DIANE P. WOOD, *Circuit Judge*

No. 11-2736

| | |
|---|---|
| UNITED STATES OF AMERICA, *Plaintiff-Appellee,* | Appeal from the United States District Court for the Southern District of Indiana, Evansville Division. |
| *v.* | No. 3:09CR00011-001 |
| CHARLES E. MILLER, II, *Defendant-Appellant.* | Richard L. Young, *Chief Judge*. |

**O R D E R**

Charles Miller robbed a bank in southern Indiana and was stopped by police on the highway after he drove away. Miller was out of his car and in handcuffs before he was asked if he had a weapon, and when he said that he did, he was asked where it was. Miller said it was under the driver's seat. That weapon—a gun—was visible through the open driver's door, and a shopping bag full of money and a dark-colored bandana could be seen through the window on the passenger's side. The police apparently opened the passenger's door to take photographs but left the items in the car as they were found. A search warrant later was obtained, and the gun and money and bandana were seized along with other evidence linking Miller to that day's bank robbery and two previous ones. He was charged

with the three robberies, 18 U.S.C. § 2113(a), and with brandishing a gun during and in relation to each, *id*. § 924(c)(1)(ii).

Before trial Miller moved to suppress his roadside statements about the gun, which had been made without benefit of *Miranda* warnings. Miller insists those statements were tainted, and therefore so was everything else found in his car. In the alternative, he claims the gun, money, and bandana were discovered during a warrantless "search" and should be suppressed on that basis. The district court denied that motion after an evidentiary hearing, and a jury found Miller guilty on all counts. He was sentenced to a total of 747 months' imprisonment.[*] In this appeal Miller challenges only the denial of his motion to suppress.

At the suppression hearing Alec Hensley, the police chief in Oakland City, Indiana, recounted his stop of Miller on April 17, 2009. Hensley had heard over the police radio that a bank in Arthur, a community about 5 miles away, had just been robbed at gunpoint. The suspect was described as a tall, thin, white male wearing a black mask and last seen fleeing the bank in a new, white, Chevrolet Malibu. Hensley parked in a spot where he could observe cars traveling on the main road leading away from Arthur. Within 5 minutes he spotted a speeding white car approaching from the direction of Arthur. He noticed that the driver, who was later identified as Miller, matched the description of the suspect.

Chief Hensley testified that after following Miller for a few miles he decided to make a "high-risk stop" once a backup officer reached the area. Hensley and the other officer signaled for Miller to pull over, and he did so next to a convenience store. Hensley exited his car and saw Miller make furtive movements "like he was grabbing for something at his seat." Hensley drew his weapon and yelled loudly and clearly for Miller to show his hands and throw his keys out of the car. At first Miller acted as though he couldn't hear the commands (even though his car window was down), but finally he complied. He climbed out of the car, leaving the driver's door open, and allowed Hensley to handcuff him. Hensley then performed a pat-down for weapons and asked Miller if he had a weapon in the car. After Miller said yes, Hensley asked where it was, and Miller replied that it was under the front seat. Hensley went to the open door, looked into the car, and saw a gun in plain view "just underneath the seat on the floor." He then walked around to the passenger's side and peered through the window. He saw what looked like a black bandana protruding from beneath a pile of clothes on the front passenger's seat and a plastic

---

[*] Miller's total sentence includes 63 months for the three bank robberies and mandatory, consecutive sentences for the three firearm counts: 84 months for the first one, *see* 18 U.S.C. § 924(c)(1)(A)(ii), and 300 months for the other two, *see* 18 U.S.C. § 924(c)(1)(C)(I). Miller is not appealing the sentence.

shopping bag lodged between that seat and the console. Currency was visible in the open bag.

Hensley then read Miller the *Miranda* warnings. He asked Miller if there was a large amount of cash in the car; Miller said yes. Hensley also asked Miller if he had just robbed the bank in Arthur; Miller said no. By this time troopers from the Indiana State Police were on the scene and took over the investigation. According to the written report of lead investigator W.W. George, deputies from the county sheriff's department "assisted Chief Hensley in the arrest and helped perform a search incident to the arrest of the passenger compartment of the suspect's vehicle." George also notes in his report that "a handgun was located underneath the driver's side seat and money in a plastic bag was located in the front seat of the passenger's side of the vehicle."

Authorities then towed the Malibu to another location to await a search warrant, which they obtained that afternoon. Gary Gulledge, an FBI agent, observed this search. At the suppression hearing he testified that the shopping bag was seized when the warrant was executed, and he added that the money was traced to the bank in Arthur. Gulledge also said that the bandana and the gun found beneath the driver's seat were seized while executing the warrant. That search also turned up a second firearm and various pieces of clothing, all of which linked Miller to one or another of the robberies.

In his motion to suppress, Miller sought to exclude from evidence his roadside statements about the gun as well as everything seized from the Malibu. Miller asserted that his statements—that he possessed a weapon and that it could be found under the driver's seat—were made in response to custodial questioning before he was given *Miranda* warnings. According to Miller, those two admissions tainted everything seized from the car. At the very least, he wanted the court to suppress the items Hensley saw when he walked around the car. Those included the first gun, the shopping bag full of money, and the bandana. Since the police discovered these items during a warrantless "search," Miller maintains this roadside search was unlawful. In his view there wasn't probable cause to search and, even if there was, the automobile exception of *Carroll v. United States*, 267 U.S. 132 (1925), applies only if it would be impracticable for police to obtain a warrant.

The district court denied the motion. The court concluded that Chief Hensley's questions about the gun were prompted by a reasonable concern for public safety and thus Miller's responses fell within the public-safety exception to *Miranda* established in *New York v. Quarles*, 467 U.S. 649 (1984). Moreover, the court explained, the automobile exception to the warrant requirement does not turn on exigency; all the government had to show was that Hensley had probable cause to search the vehicle. And the court held Hensely did have probable cause, with or without Miller's admissions about the presence of the gun.

On appeal Miller's lawyer (who also represented him in the district court) has failed to convince us that the trial judge erred. Miller was handcuffed and outside of his car at the time of the questioning. Since Hensley had no reason to fear for his or the public's safety, Miller contends that the roadside "search" was not authorized by the automobile exception; he no longer contends that probable cause was absent, but he continues to insist that *Carroll* applies only when getting a warrant is impracticable.

The district court properly refused to suppress Miller's statements. Police officers can interrogate a suspect without first giving *Miranda* warnings if they reasonably believe that the questions posed are "necessary to secure their own safety or the safety of the public." *Quarles*, 467 U.S. at 659. Chief Hensley had been alerted that the suspect—whose physical appearance and car matched Miller's—had a gun. This knowledge gave Hensley a specific reason to ensure that Miller could not reach a weapon and harm him or citizens at the nearby convenience store. *See United States v. Are*, 590 F.3d 499, 505–06 (7th Cir. 2009); *United States v. Edwards*, 885 F.2d 377, 384 (7th Cir. 1989); *United States v. Estrada*, 430 F.3d 606, 613 (2d Cir. 2005); *United States v. Reyes*, 353 F.3d 148, 154 (2d Cir. 2003). Courts (including the Supreme Court in *Quarles*) have upheld reliance on the public-safety exception even where the defendant was in handcuffs. *Quarles*, 467 U.S. at 652; *Are*, 590 F.3d at 506; *Edwards*, 885 F.2d at 380; *United States v. Watters*, 572 F.3d 479, 481–83 (8th Cir. 2009*).* Miller's gun could have been within his reach; the driver's door was open, and he might have lunged for the gun on the floorboard. *See Are*, 590 F.3d at 506; *United States v. Tejada*, 524 F.3d 809, 811–12 (7th Cir. 2008).

The key point, though, is that with or without Miller's statements, the gun would have been found. Hensley had been alerted by radio that the suspect was armed. Soon enough he would have seen the gun on the floorboard through the open door, and nothing that Miller said (or might not have said) about the gun would have altered the events that followed. The gun was going to be found, and its link to Miller was obvious.

The district judge also correctly refused to suppress the physical evidence. Miller's theory is that police were not authorized to conduct a warrantless roadside search, but the essential premise—that the Malibu was searched where it was stopped—is doubtful. It is true that Detective George, from the state police, wrote in his report that sheriff's deputies helped Chief Hensley search the passenger compartment. But George did not testify at the suppression hearing or at trial. Hensley did. At the suppression hearing Hensley said that he looked through the open driver's door and the passenger's window and that is all; on cross-examination he was explicit that he did not search the car or even put his head inside the vehicle. And at trial he added that another investigator opened the passenger's door for a state trooper to photograph what Hensley had seen through the window. At oral

argument Miller's counsel recalled Hensley saying he "did rummage through some of the vehicle," but the transcripts of the suppression hearing and trial refute that understanding. Looking through the windows at the contents of a car does not constitute a search. *Edmond v. Goldsmith,* 183 F.3d 659, 661 (7th Cir. 1999); *United States v. Ware,* 914 F.2d 997, 1000 (7th Cir. 1990). And though the police opened the passenger's door before taking the photographs, doing so did not expose any new contents. *See Arizona v. Hicks,* 480 U.S. 321, 324–25 (1987); *United States v. Paneto,* 661 F.3d 709, 714 n.3 (1st Cir. 2011); *United States v. Muniz-Melchor,* 894 F.2d 1430, 1436 (5th Cir. 1990).

Even if the roadside events did constitute a search, however, that search was authorized under the automobile exception to the warrant requirement. Miller no longer disputes that the police had probable cause to search the Malibu. There is no exigency requirement; since Miller's car was readily moveable—even if it wasn't immediately mobile—the police could search the car. *See Maryland v. Dyson,* 527 U.S. 465, 466 (1999); *United States v. Zahursky,* 580 F.3d 515, 521–23 (7th Cir. 2009); *United States v. Hines,* 449 F.3d 808, 814 (7th Cir. 2006); *United States v. Washburn,* 383 F.3d 638, 641 (7th Cir. 2004); *United States v. Howard,* 489 F.3d 484, 492–494 (2d Cir. 2007).

AFFIRMED.