**UNITED STATES of America**

v.

**100 CUBAN CIGARS etc.**

**Civil Action No. 98–3728.**

United States District Court,
E.D. Pennsylvania.

Jan. 7, 1999.

instant motion.

Colleen Piccone, U.S. Customs Service, Office of the Associate Chief Counsel, New York City, John Flynn, U.S. Customs Service, Office of the Associate Chief Counsel, Baltimore, MD, for U.S.

Stephen P. Patrizio, Dranoff and Patrizio, Philadelphia, PA, for David G. Weisenthal.

## MEMORANDUM

DALZELL, District Judge.

As a result of David G. Weisenthal's brief visit to Cuba in March of 1997, he returned to Philadelphia with gifts of Cuban products having a value in Cuba of less than one hundred dollars. Believing that these tobacco and other trinkets violated the American embargo against importing Cuban products, the United States Customs Service on April 18, 1997 seized all of these goods.[1]

Because Weisenthal wants his cigars and other Cuban *tsatskes* back, he on May 20, 1998 brought an action against the United States, *Weisenthal v. United States*, Civil Action No. 98–MC–83. The Government three months later brought the instant *in rem* action for forfeiture of these same items, and on October 28, 1998 we consolidated it with Weisenthal's earlier action.

After a nonjury trial yesterday, this will constitute our Fed.R.Civ.P. 52(a) findings of fact and conclusions of law in this matter.[2]

---

1. To be precise, the items that are the subject of this action are one hundred Cuban cigars, nine Cuban cigarettes, one Cuban wooden jewelry box, five Cuban key chains, one Cuban coin, and fifteen Cuban mini-cigars.

2. We have jurisdiction under 28 U.S.C. §§ 1345, 1345 and 19 U.S.C. §§ 1600, 1604.

The Government and Weisenthal have stipulated to certain basic facts. They agree that on April 18, 1997, Weisenthal arrived at Philadelphia International Airport aboard an Air Jamaica flight from Montego Bay, Jamaica. Before landing, Weisenthal filled out and signed a Customs Declaration (Customs Form 6059B). Weisenthal and the Government agree that Weisenthal did not have a license to import his Cuban goods from the Department of the Treasury, Office of Foreign Assets Control (hereinafter "OFAC"), the agency responsible for administering the Cuban Assets Control Regulations, Part 515, 31 C.F.R.[3]

The Government has put forth two theories under which it claims that the defendant items are subject to forfeiture. First, it argues that Weisenthal failed to declare the goods to Customs officials upon his arrival at the Philadelphia International Airport, and therefore they are subject to forfeiture under 19 U.S.C. § 1497 (and also should be treated as smuggled pursuant to 19 C.F.R. § 148.18 and forfeited under 19 U.S.C. § 1595a(c)(1)(A)). Second, it contends that Weisenthal violated the Cuban embargo when he imported Cuban merchandise into the United States without first obtaining a license from OFAC, and therefore that the items should be forfeited under 19 U.S.C. § 1595a(c)(2)(B). We will consider each of these arguments in turn.

### A. Burdens of Proof

In a civil forfeiture proceeding, the Government must first establish probable cause to forfeit the defendant property. *See* 19 U.S.C. § 1615; *United States v. On Leong Chinese Merchants Ass'n,* 918 F.2d 1289, 1292 (7th Cir.1990). "Probable cause" is defined as "reasonable ground for the belief of guilt supported by less than prima facie proof but more than mere suspicion." *United States v. Three Hundred Sixty Four Thousand Nine Hundred Sixty Dollars,* 661 F.2d 319, 323 (5th Cir.1981), citing *United States v. One 1978 Chevrolet Impala,* 614 F.2d 983, 984 (5th Cir.1980) (per curiam).

As we stated in open court yesterday, we find that the Government has shown probable cause with respect to both of its theories for forfeiture. One Customs official stated that Weisenthal failed to declare the Cuban items, so there is probable cause for the Government's first theory. And it is undisputed that Weisenthal did not have a license from OFAC to import Cuban merchandise, so there is probable cause for the Government's second theory.

Once probable cause is established, the burden of proof shifts to the claimant to establish by a preponderance of the evidence that the property is not subject to forfeiture. *See United States v. Edwards,* 885 F.2d 377, 390 (7th Cir.1989). Weisenthal therefore bears the burden of disproving both of the Government's theories.

### B. Weisenthal's Alleged Failure to Declare Cuban Merchandise

The Government alleges that Weisenthal did not declare the defendant items to Customs officials upon his arrival at the Philadelphia International Airport, and therefore that they are subject to forfeiture.[4] Customs

---

**3.** The Cuban Assets Control Regulations, which were enacted in 1963 in response to the Cuban Missile Crisis and to deal with the peacetime emergency created by Cuban attempts to destabilize Latin American governments, *see, e.g., Regan v. Wald,* 468 U.S. 222, 226, 104 S.Ct. 3026, 82 L.Ed.2d 171 (1984), prohibit, *inter alia,* the importation of merchandise acquired in Cuba without a license from OFAC. These regulations were promulgated under the Trading With the Enemy Act of 1917, 40 Stat. 411, as amended, 50 U.S.C.App. § 1 *et seq.* Though a child of the Cold War that ended seven years ago with the Soviet Union's extinction, the Cuban embargo remains very much alive, though many are prepared to reconsider it, including veteran Cold Warriors like Henry A. Kissinger. *See* Tim Wein-

er, "Anti–Castro Exiles Won Limit on Changes: Others Urged Bigger Steps, but Couldn't Prevail in Political Climate," *The New York Times,* Jan. 6, 1999, at A8.

**4.** The Government relies on 19 U.S.C. §§ 1497(a)(1) and 1595a(c)(1)(A), as well as 19 C.F.R. § 148.18(a), as its legal authority for the forfeiture of the articles. 19 U.S.C. § 1497(a)(1) provides that any article which is not included in a declaration and is not mentioned before examination of a traveler's baggage begins shall be subject to forfeiture. 19 C.F.R. § 148.18(a) provides that undeclared articles are treated as smuggled, thereby subjecting them to forfeiture under 19 U.S.C. § 1595a(c)(1)(A) ("[M]erchandise shall be seized and forfeited if it … is …

Inspector Paul Nardella testified that Weisenthal, when he arrived at the Inspector's secondary examination station, told him that he had nothing to declare. Inspector Nardella testified that he then searched Weisenthal's luggage and discovered the offending goods.

Weisenthal disputes the Government's allegation. He testified that upon his arrival at the Philadelphia International Airport, an unidentified Customs officer took his declaration card [5] and asked if he had anything to declare. Weisenthal testified that he told the Customs official that he had "alcohol and tobacco products" to declare, and, based on that statement, the official referred Weisenthal to Inspector Nardella's secondary examination station. A mark, "T–1", on the upper right corner of the declaration card confirms (as the Government concedes) that Weisenthal indeed saw a "roving inspector" before he saw Inspector Nardella. Because this "roving inspector" has not been identified (despite the parties' efforts to find him), Weisenthal's testimony on this point is unrebutted, and we in any event accept it.

Weisenthal testified that he also told Inspector Nardella that he had tobacco within the duty-free limit to declare. We give more weight to Weisenthal's recollection on this point than we do to Inspector Nardella's, because the events that day were far more extraordinary to Weisenthal than they were to this seasoned Inspector. Inspector Nardella testified that as a Customs Inspector, he interacts with as many as forty passengers per day. It is therefore not surprising that the Inspector's memory of the particu-

lars of the incident was not as consistent or exact as Weisenthal's.

We therefore hold that Weisenthal properly declared all of the seized items to Customs officials.

### C. Weisenthal's Violation of the Cuban Embargo

The Government's second argument is that the property is subject to forfeiture because Weisenthal violated the Cuban embargo. Specifically, the Government alleges that Weisenthal violated 31 C.F .R. § 515.204, which is part of the Cuban Assets Control Regulations. That regulation provides:

> [e]xcept as specifically authorized by the Secretary of the Treasury . . . by means of regulations, rulings, instructions, licenses, or otherwise, no person subject to the jurisdiction of the United States may purchase, transport, import, or otherwise deal in or engage in any transaction with respect to any merchandise outside the United States if such merchandise:

> (1) is of Cuban origin . . . .

31 C.F.R. § 515.410, an interpretive regulation which the Treasury Department added in 1974, states that "Section 515.204 prohibits, unless licensed, the importation of commodities of Cuban origin."

As far as the parties and we can tell, there are no reported decisions construing either of these regulations, or of those cited and discussed later in this Memorandum.

It is undisputed that Weisenthal did not have a license from OFAC. The items, there-

---

smuggled . . . or clandestinely imported or introduced.'').

5. Item number fourteen on the declaration card asks for the total value of all goods purchased or acquired abroad which the traveler is bringing into the United States. Weisenthal put a dash in the box which asks for this dollar amount. The back of the declaration form requires a description of any such articles. Weisenthal left this section blank. He explained that he did this because he believed that since the value of the articles he was bringing into the country was below his $400 duty-free exemption, he did not need to declare anything in writing. He is correct. 19 C.F.R. § 148.12(b)(1)(i)(A) provides that a returning resident may make an *oral* declaration if the "aggregate fair retail value in the

county of acquisition of all accompanying articles acquired abroad by him . . . does not exceed . . . $400." The Government has stipulated that the total value of the seized items is less than $100 and that Weisenthal carried the items with him at Philadelphia International. Thus, Weisenthal was not obligated to declare anything in writing, and he did not make a misrepresentation by placing a line in the box. Furthermore, because Weisenthal stated that he received the Cuban items as gifts, he may well not have known their value, and his only alternative may have been to place a line in the box. The only issue for us on this point, therefore, is whether Weisenthal in fact made an *oral* declaration to Customs officials at the Philadelphia International Airport.

fore, are subject to forfeiture under 19 U.S.C. § 1595a(c)(2)(B), which provides:

(c) Merchandise which is introduced ... into the United States contrary to law shall be treated as follows:

. . .

(2) [M]erchandise may be seized and forfeited if—

. . .

(B) its importation or entry requires a license, permit or other authorization of an agency of the United States Government and the merchandise is not accompanied by such license, permit, or authorization.

■ While Weisenthal admits that he did not have a license to import the Cuban items, he argues that he did not violate the regulations because he relied on the April 1994 edition of a Customs Service brochure entitled "Know Before You Go," which a Cus-

toms official gave him on a previous trip.[6] This brochure, at page six, discusses a traveler's duty-free exemptions. and states that

[n]ot more than 100 cigars and 200 cigarettes (one carton) may be included in your exemption. Products of Cuban tobacco may be included if purchased in Cuba, see page 20.[7]

Weisenthal's argument is that the plain language of page six of "Know Before You Go" should be regarded as "instructions" within the meaning of Regulation 515.204, thereby authorizing United States citizens to import a limited amount of tobacco products from Cuba. The term "instructions" is not defined anywhere within Part 515. Counsel for the Government stated that as far as he knew, OFAC has never issued an "instruction" and that there are no agency rulings discussing what an "instruction" is, despite the fact that "instructions" are mentioned in the regulations.[8] Thus, Weisenthal gave

6. Weisenthal's passport, at page two, also referred him to "Know Before You Go," stating that the brochure provided "current information about Customs requirements and how they apply to articles acquired abroad." It is evident from his testimony that Weisenthal paid such utmost heed to the passport's suggestion that he read, marked, learned, and inwardly digested the contents of "Know Before You Go" to such an extent that he could quote them to Inspector Nardella. Specifically, he cited page six of the brochure, excerpted above.

7. Being charitable to the Customs Service, the reference to "page 20" does nothing to illuminate this simple English sentence. We reproduce the text of page 20 in its entirety:

*Books, Records, Computer Programs and Cassettes*
Pirated copies of copyrighted articles—unlawfully made articles produced without the authorization of the copyright owner—are prohibited from importation into the United States. Pirated copies will be seized and destroyed unless the importer can demonstrate that he had no reasonable grounds for believing his actions violated the law. Then, they may only be returned to the country of export.
*Ceramic Tableware*
Some ceramic tableware sold abroad contains dangerous levels of lead in the glaze that can leach into certain foods and beverages served in them. The Food and Drug Administration recommends that ceramic tableware, especially when purchased in Mexico, China, Hong Kong or India, be tested for lead release on your return or be used for decorative purposes only.

*Cultural Property (Objects/Artifacts)*
U.S. law prohibits the importation of pre-Columbian monumental and architectural sculpture and murals from Mexico and from certain countries in Central and South America. These importations are prohibited no matter where the artifacts are shipped from, be it the country of origin or elsewhere.
Federal law and international treaties prohibit the importation of any articles of stolen cultural property from museums, religious, or secular public monuments. Would-be buyers of such property should be aware that, unlike purchases of customary tourist merchandise, purchases of cultural objects do not confer ownership should such an object be found to be stolen.
Imports of certain archeological and ethnographic material (e.g., masks or textiles) from Bolivia, El Salvador, Guatemala, Peru, and Mali are restricted and require export certificates from the country of origin. Purveyors of such merchandise have been known to offer phony export certificates, and again, . . . .
The citation to "page 20" of the booklet is, quite obviously, meaningless. It inexplicably contains no information about Cuban tobacco products. Counsel for the Government agreed that the citation was, in fact, "gibberish." OFAC has since revised the document and eliminated this odd reference.

8. At closing argument, the Customs Service referred to the word as being part of "boilerplate". When we pointed out to him that there was no such thing as "boilerplate" in federal statutes and regulations, he retreated.

OFAC more credit than the agency was due when he assumed that the mention of "instructions" in the regulations meant that OFAC actually would issue an "instruction" from time to time, or that OFAC (or Customs) even knew what an "instruction" was.

In the end, however, Weisenthal's contention must fail because it is merely supported by common sense. Because it was the Customs Service, and not OFAC, who published "Know Before You Go," the brochure could not be an *OFAC* "instruction" within the meaning of OFAC's Regulation 515.204. Also, 31 C.F.R. § 515.502(b) provides that "[n]o ... instruction ... authorizes a transaction prohibited under this part unless the ... instruction ... specifically refers to this part." As page six of "Know Before You Go" does not mention the regulations, § 515.502(b) tells us that we may not construe it as authorizing the importation of Cuban articles without a license. Finally, as the Government pointed out at trial, the brochure directs travelers to contact the Customs Service if they have any questions, which Weisenthal admits that he did not do, although that may be because he reasonably did not think that there was any ambiguity in the sentence on page six. We therefore are constrained to hold that "Know Before You Go" was not an "instruction" allowing the importation of Cuban tobacco.

Weisenthal's argument—that he relied on an official Government publication, and therefore did not violate any laws—is nevertheless quite attractive. He is a reasonable and experienced American traveler who in good faith attempted to comply with Customs regulations. His passport directed him to consult "Know Before You Go" for further information, and he did just that. Page six of the brochure contained a simple English sentence to which he gave ordinary meaning, though if he incorporated "page 20" to that simple sentence he would have had, to be sure, confusion and gibberish to decipher.

He reasonably believed that he was authorized to import the "Cuban tobacco" as accompanied baggage.

Unfortunately, the issue is not whether Weisenthal's reading of the brochure was reasonable—which it most assuredly was— but whether Weisenthal had a license to import Cuban merchandise. 31 C.F.R. § 515.204 does not contain a *mens rea* requirement, and therefore even the most honest and reasonable intentions cannot save Weisenthal's cigars.[9]

■ Weisenthal also argues that he did not violate the Cuban embargo because his travel was "fully sponsored" by his friend, Andreas Doelling, a German citizen and resident alien of Jamaica, as a birthday present. 31 C.F.R. § 515.560(g)(2) does state that "if [a] traveler can establish that all necessary transactions involved fully sponsored or fully hosted travel within Cuba, such transactions do not violate the prohibitions of this part." Weisenthal argues that this provision authorizes him to import Cuban merchandise because (c)(3) of that section provides that someone who is authorized to travel to Cuba may purchase, and import as "accompanied baggage", merchandise with a foreign market value not to exceed $100. However, (g)(1) of that section states that "the authorization contained [in (c)(3) ] does not apply to fully sponsored or fully hosted travelers." Thus, Weisenthal has misconstrued the "fully sponsored" exception, which gives him no safe haven.

■ Lastly, Weisenthal asks that we direct OFAC to issue a "specific license" pursuant to 31 C.F.R. § 515.801(b) (July 1, 1997 ed.) because "an unusual problem is presented".[10] It is true that § 515.544(b)(2) covers "goods which are imported by a person entering the U.S., which are claimed to have been acquired in Cuba as a bona fide gift,"

---

9. Though the many oddities here may seem to Weisenthal worthy of *Dr. Strangelove, see supra* note 3.

10. This subsection of § 515.801 reads as follows: *(b) Specific licenses—(1) General course of procedure.* Transactions subject to the prohibitions contained in subpart B of this part which

are not authorized by general license may be effected only under specific license. When an unusual problem is presented, the proposed action is cleared with the Director of the Office of Foreign Assets Control or such person as he may designate.

but the regulation subjects this general rule to the conditions that:

(i) The goods are of small value, and

(ii) There is no reason to believe that there is, or has been since July 8, 1963, any direct or indirect financial or commercial benefit to Cuba or nationals thereof from the importation.

31 C.F.R. § 515.544(2). While it is undisputed that the goods at issue were "of small value" at least in Cuba, we do not see how we could hold that their purchase did not have "any direct or indirect financial or commercial benefit to Cuba or nationals thereof" since they were, in fact, *bought* in Havana. Although Weisenthal suggested to us that the purchase of these items "on the black market" meant that the Castro regime was not enriched by these transactions, the regulation also mentions Cuban "nationals" who, we may safely assume, were happy to receive the dollars or Deutschemarks from Herr Doelling.

We therefore must consign these cigars to the Government's pyre rather than Weisenthal's humidor.[11]

### JUDGMENT AND ORDER OF FORFEITURE

AND NOW, this 7th day of January, 1999, after a nonjury trial yesterday, and in accordance with the findings of fact and conclusions of law contained in the accompanying Memorandum, it is hereby ORDERED that:

1. JUDGMENT IS ENTERED in favor of plaintiff United States of America and against defendant property;

2. All right, title, and interest of David G. Weisenthal and his heirs and assigns in the following property is hereby FORFEITED TO AND VESTED IN the United States of America: one hundred Cuban cigars; nine Cuban cigarettes; one Cuban wood jewelry box; five Cuban key chains; one Cuban coin; and fifteen Cuban mini cigars; and

11. Although Inspector Nardella testified that his job is to "protect the revenue of the United States," the forfeiture here will not add to the coffers of his employer, the United States Department of the Treasury. Rather, the cigars will go up in a puff of rich smoke in the Customs Service's incinerator.

3. The Clerk shall CLOSE this case statistically.