**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1966-18

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

STEVEN L. BOOKMAN,
a/k/a STEVEN BOOKMAN,
LAMONT BOOKMAN, SHAW
FORREST, SHAWN FORREST,
and STEVEN SHARP,

     Defendant-Appellant.

_____

       Argued January 19, 2021 – Decided May 4, 2021

       Before Judges Fasciale and Susswein.

       On appeal from the Superior Court of New Jersey, Law Division, Camden County, Indictment No. 18-01-0010.

       Jennifer A. Randolph, Designated Counsel, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; Jennifer A. Randolph, on the briefs).

       Sarah D. Brigham, Deputy Attorney General, argued the cause for respondent (Gurbir S. Grewal, Attorney

General, attorney; Sarah D. Brigham, of counsel and on the brief).

PER CURIAM

Defendant appeals from his jury trial conviction for second-degree certain persons not to have weapons, N.J.S.A. 2C:39-7(b). He contends the trial court erred in denying his motion to suppress the handgun found in his jacket pocket. He also contends his admission to police that the gun was concealed in his pocket was elicited in violation of his Miranda rights.[1] Defendant further contends the trial court erred by denying his Batson/Gilmore[2] motion contesting the prosecutor's use of peremptory juror challenges, and by allowing the State at trial to elicit testimony regarding another gun and drugs that were found in the residence into which defendant had fled. He also argues the court imposed an excessive sentence.

After carefully reviewing the record in light of the applicable principles of law, we reject all but one of defendant's contentions. The record before us shows that the trial court abruptly ended the Batson/Gilmore hearing after the prosecutor offered a race-neutral explanation for only one of the two African

---

[1] Miranda v. Arizona, 384 U.S. 436 (1966).

[2] Batson v. Kentucky, 476 U.S. 79 (1986); State v. Gilmore, 103 N.J. 508 (1986).

2

American jurors who, defendant claims, were impermissibly challenged on the basis of race. We remand the matter for the trial court to complete the truncated hearing. In all other respects, we affirm the conviction and sentence, subject to the outcome of the Batson/Gilmore hearing on remand.

I.

In January 2018, a grand jury indicted defendant for second-degree unlawful possession of a firearm, N.J.S.A. 2C:39-5(b), and second-degree unlawful possession of a firearm by a certain person, that is, a person previously convicted of a specified crime, N.J.S.A. 2C:39-7(b). Defendant filed a motion to suppress the handgun. The motion judge convened an evidentiary hearing after which defendant's motion to suppress was denied.

On October 23, 2018, a different judge granted the State's motion to admit into evidence admissions defendant made during the encounter with police. That judge, who presided over the trial, also granted the State's motion to dismiss count one of the indictment for second-degree unlawful possession of a firearm, N.J.S.A. 2C:58-4, 2C:39-5(b).

Jury selection occurred over the span of two days. At the conclusion of the voir dire process, defendant asserted a Batson/Gilmore violation, claiming the prosecutor improperly excused two of the three African American jurors on

3

the panel. The trial judge denied defendant's motion after requiring the prosecutor to explain why only one of the two minority jurors had been peremptorily excused.

The trial judge convened a bifurcated trial from October 30, 2018 to November 1, 2018, after which the jury found defendant guilty of the certain persons handgun offense. Defendant appeared before the trial judge for sentencing on December 7, 2018. The judge denied the State's motion to impose an extended term as a persistent offender pursuant to N.J.S.A. 2C:44-3(a). The judge then imposed an eight-year prison term with a five-year period of parole ineligibility. The judge ordered the sentence to be served consecutively to the prison term defendant was already serving on his prior convictions for second-degree unlawful possession of a weapon, N.J.S.A. 2C:39-5(b)(1), second-degree certain persons not to have a weapon, N.J.S.A. 2C:39-7(b)(1), third-degree hindering, N.J.S.A. 2C:29-3(b)(4), and fourth-degree resisting arrest, 2C:29-2(a)(2).

Defendant raises the following contentions for our consideration:

> POINT I
>
> THE TRIAL COURT ERRED IN DENYING DEFENDANT'S MOTION TO SUPPRESS BECAUSE THE OFFICERS' WARRANTLESS ENTRY INTO 1237 THURMAN STREET AND "PROTECTIVE

4

FRISK" OF DEFENDANT WERE UNCONSTITUTIONAL

A. THE OFFICERS' ENTRY INTO 1237 THURMAN STREET WAS NOT JUSTIFIED BY THE HOT PURSUIT EXCEPTION TO THE WARRANT REQUIREMENT

B. EVEN IF THE OFFICERS LAWFULLY ENTERED 1237 THURMAN STREET, THE SEARCH OF DEFENDANT EXCEEDED THE SCOPE OF THE PERMISSIBLE ENTRY

1. POLICE EXCEEDED THE SCOPE OF A PROTECTIVE SWEEP OF THE DWELLING WHEN THEY DETAINED AND SEARCHED DEFENDANT

2. THE SEARCH OF DEFENDANT EXCEEDED THE BOUNDS OF A TERRY STOP AND FRISK, AND POLICE LACKED THE REQUISITE PROBABLE CAUSE

3. POLICE LACKED REASONABLE SUSPICION TO SUPPORT A TERRY STOP AND FRISK

POINT II

DEFENDANT'S ALLEGED STATEMENTS TO POLICE SHOULD HAVE BEEN EXCLUDED AS ELICITED IN VIOLATION OF DEFENDANT'S RIGHTS

POINT III

5

ADMISSION OF TESTIMONY REGARDING OTHER ITEMS SEIZED FROM 1237 THURMAN STREET CONSTITUTED REVERSIBLE ERROR

POINT IV

THE TRIAL COURT VIOLATED DEFENDANT'S RIGHT TO TRIAL BY AN IMPARTIAL JURY BY ALLOWING THE STATE TO EXCLUDE JURORS ON THE BASIS OF RACE

POINT V

DEFENDANT'S SENTENCE IS MANIFESTLY EXCESSIVE

## II.

We first address defendant's contention the motion judge erred in denying the motion to suppress the handgun. We discern the following facts from the suppression hearing.

In the early morning hours of November 2, 2017, a team of New Jersey State Police members assembled at the 1200-block of Thurman Street in Camden to execute an arrest warrant for Julian Bell,[3] who resided at 1235 Thurman Street. The State Police had been conducting a long-term investigation of motorcycle thefts in the area. Earlier that evening, they observed Bell engaging

---

[3] Bell is not a codefendant and is not a party to this appeal.

in a suspected narcotics transaction in front of the 1235 residence. The officers had an outstanding Automated Traffic System ("ATS") warrant for Bell.

The team of officers observed a group of several men, including Bell and defendant, standing in front of 1235 and 1237 Thurman Street. The team approached and identified themselves as police officers, which prompted the group of men to flee. The officers observed Bell and defendant running toward the 1237 residence. The officers pursued Bell and followed him into the residence. The officers lost sight of Bell and defendant. Once inside, the officers conducted a sweep-search of the premises for Bell. One of the officers, Detective DeVirgiliis, looked into a room that had no furniture. He observed defendant lying prone on the floor with his arms stretched out in what the detective described as a "safety position." Detective DeVirgiliis had not ordered defendant to assume that submissive position. Detective DeVirgiliis knew that the person on the floor was not Bell. The detective handcuffed defendant as a precautionary measure and asked if he had any weapons. Defendant responded that he had a knife. Detective DeVirgiliis conducted a frisk during which he secured the knife, which was clipped to defendant's belt. The detective also observed a bulge and removed cigarettes, a lighter, and keys. While conducting the frisk, Detective DeVirgiliis told defendant he would probably be let go soon,

7

A-1966-18

as he was not the subject of the investigation. Defendant replied it was unlikely he would be released. Detective DeVirgiliis—who was still frisking defendant—asked for clarification, and defendant said "'[n]o, you're not going to let me go because I have a gun in my jacket pocket.'" The jacket was on the floor near defendant. Detective DeVirgiliis found the gun in the jacket pocket and removed it.

Defendant contends the State Police officers had no lawful authority to pursue Bell into the residence, to conduct a sweep search, to conduct the protective frisk of defendant's person or the frisk of the nearby jacket that revealed the firearm. We disagree. Every step taken by the officers in the swiftly unfolding sequence of events was objectively reasonable and lawful.

We begin our analysis by acknowledging that appellate courts "must uphold the factual findings underlying the trial court's decision, so long as those findings are 'supported by sufficient credible evidence in the record.'" State v. Evans, 235 N.J. 125, 133 (2018) (quoting State v. Elders, 192 N.J. 224, 243 (2007)). An appellate court should defer to the trial judge's factual findings, as the trial judge has a better opportunity to get a "feel" of the case. Elders, 192 N.J. 244. Relatedly, a trial judge's credibility determinations should be upheld if such determinations are supported by sufficient, credible evidence. State v.

S.S., 229 N.J. 360, 374 (2017). In contrast, a reviewing court is not required to afford such deference to a trial court's legal conclusions, which are reviewed de novo. State v. Bryant, 227 N.J. 60, 71–72 (2016); State v. Hathaway, 222 N.J. 453, 467 (2015).

At the suppression hearing, the State presented testimony from three State Police officers, including Detective DeVirgiliis. Defendant presented testimony from Bell. Bell testified that he ran out the back door of the residence, contradicting the testimony of the State Police member who was stationed to guard the rear door and who testified that no one had exited the residence.

The motion judge found that the State Police witnesses were credible, noting they each were "responsive to the questions that were asked of them and fully responded to the questions." In contrast, the judge questioned Bell's credibility, noting that he "was not clearly responsive in his answers."

The judge determined that the officers were justified in entering the premises under the hot pursuit doctrine, were permitted to conduct a sweep-search of the residence to look for Bell and were justified in detaining and frisking defendant and his jacket once they found him lying prone of the floor with his arms outstretched and he admitted to possessing weapons. We address

9

each of these distinct police actions in turn, beginning with the police entry into the residence in pursuit of Bell.

We conclude the police entry was lawful under the hot pursuit doctrine as explained and applied by our Supreme Court in State v. Jones, 143 N.J. 4 (1995). The facts of that case are similar to the circumstances that unfolded in the present case. The police in that case were conducting a surveillance that was unrelated to Jones. Officers observed a vehicle containing defendant and a companion, Collier, pull into the parking lot. Id. at 8. One officer recognized Collier from previous encounters and remembered seeing an outstanding warrant for his arrest earlier that evening, although the officer did not know the offenses underlying the warrant. Ibid. Subsequently, the officer learned that the warrant was issued for failure to pay fines assessed for drug paraphernalia convictions. Ibid. The officers exited their vehicle and approached Collier and Jones. Ibid. Both fled into an apartment building with the two police officers not far behind. Ibid. Collier and Jones ran up the stairs and entered an apartment. Ibid. The officers tried the door, found it locked, and kicked it down. Id. at 9.

In sustaining the forcible entry, the Court explained that "'[o]fficers have no discretion in making arrests where there is an outstanding warrant.'" Id. at

A-1966-18

14. (quoting Stone v. State, 620 So. 2d 200, 201 (Fla. Dist. Ct. App. 1993)). "In fact," the Court noted, "had the officers failed to attempt to effectuate the warrant, they would have been derelict in their duties." Ibid. Accordingly, the Court held,

> under both statutory and decisional law, the officers had a right to effect the arrest of co-defendant Collier by entering the apartment. The officers were acting under a validly issued arrest warrant. Collier fled into an apartment building. The officers followed in hot pursuit. They observed defendant and Collier run into [the] apartment . . ."
>
> [Id. at 14].

The Court rejected Jones's contention that the hot pursuit entry was unlawful because the warrant was not for an indictable crime. The Court explained that,

> [i]n view of the significance that attaches to the issuance of a warrant and the fact that "every arrest, regardless of the nature of the offense [may] present a risk of danger to an officer," . . . to require police officers to distinguish between arrest warrants issued for minor and serious offenses would be unreasonable.
>
> [Id. at 17 (quoting State v. Bruzzese, 94 N.J. 210, 233 (1983))].

The Court thus held that police officers acting pursuant to a valid arrest warrant have the right to follow a fleeing suspect into a private residence. Id. at 19.

11

Applying that rule to the facts before us, we conclude the State Police officers were justified in pursuing Bell into the private residence based on the outstanding ATS warrant.

We likewise reject defendant's contention that the officers were precluded from fanning out within the residence to find Bell after they crossed the threshold in hot pursuit. The record shows the officers lost sight of Bell after he entered the residence, prompting them to undertake a limited visual inspection of possible locations where Bell could be hiding.

We note that the officers were not conducting a protective sweep pursuant to the doctrine announced in Maryland v. Buie, 494 U.S. 325, 327 (1990), which is designed to protect officers from being ambushed by other occupants when they are lawfully inside a residence to make an arrest. Rather, in this instance, the officers were conducting a sweep search for Bell. Their authority to search the residence for him derived from their authority to enter the residence under the hot pursuit doctrine. The exigency that justified the intrusion into the residence did not suddenly evaporate when the officers crossed the threshold. Rather, the exigency that justified the entry continued unabated until Bell was

12

either apprehended or left the premises.[4]  Because the purpose of the hot pursuit entry was to locate and apprehend Bell, the officers' authority to cross the threshold of the residence extended to rooms within the residence into which Bell may have retreated.

The record before us clearly shows, moreover, that the search of the premises for Bell was narrowly confined to a cursory visual inspection of those places where he could be hiding.  We therefore hold that Detective DeVirgiliis lawfully entered the room where he encountered defendant.

We next address defendant's contention that the detective had no lawful authority to detain and frisk him.  In view of the chaotic events leading to the encounter, including not only defendant's flight from police but also the unusual position on the floor he assumed in anticipation of the police encounter, the officers had reasonable and articulable suspicion upon which to briefly detain defendant under the Terry[5] doctrine.  See State v. Thomas, 110 N.J. 673, 677–78 (1988) (applying a totality of the circumstances test in determining the

---

[4] As we have noted, the motion court accredited an officer's testimony that, contrary to Bell's testimony, Bell did not flee from the premises through the back door.  Accordingly, the officers were still searching the premises for Bell at the moment Detective DeVirgiliis encountered defendant lying prone on the floor in an empty room.

[5] Terry v. Ohio, 392 U.S. 1 (1968).

existence of reasonable suspicion to justify an investigative detention under Terry); see also State v. Roach, 172 N.J. 19, 27 (2002). We note that defendant fled from the approaching officers along with Bell, who police had observed engaging in drug distribution activity earlier that evening. Fleeing into the residence with Bell provided a reason for the officers to suspect that defendant and Bell were acting in concert and that defendant was linked to Bell's observed criminal activity. Cf. State v. Tucker, 136 N.J. 158, 169 (1994) (noting that unexplained flight, by itself, does not automatically provide reasonable suspicion to justify an investigative detention). We add the officers never ordered defendant to halt. Nor did they order defendant to get on the floor. He did that on his own before Detective DeVirgiliis entered the room.

Defendant's flight into the residence, coupled with the submissive position on the floor he had assumed even before Detective DeVirgiliis entered the room, also provided reasonable suspicion to believe he posed a danger to the detective and other officers. As the motion judge aptly noted, given the totality of the circumstances, the chaotic situation "created an objectively dangerous situation for police." We believe it was reasonable in these circumstances for Detective DeVirgiliis to suspect that defendant had fled into the residence to acquire or discard a weapon. By removing the jacket, he had been wearing, moreover,

defendant signaled that he did not want the officers to encounter him while he was still wearing the garment. We stress that the frisk of defendant's person was initiated only after defendant admitted to possessing a knife.[6]  The frisk of the nearby jacket on the floor occurred after defendant admitted that it concealed a firearm.[7]  We therefore hold the handgun was lawfully seized from defendant's jacket pocket under the Terry protective frisk doctrine.

## III.

We turn next to defendant's contention that his admissions to Detective DeVirgiliis that he possessed a knife, and a gun were elicited in violation of Miranda.  It is not disputed that defendant was not apprised of his Miranda rights before making those admissions.  Nor is it disputed that defendant was handcuffed when he uttered the admissions in response to the detective's question regarding the presence of weapons.  Defendant claims the level of

---

[6] In the next section, we address defendant's contention that his admissions were elicited in violation of Miranda and that the basis for frisking the jacket was the fruit of that violation.

[7] We note that had the detective not found the handgun, defendant would have been released from the investigative detention and would have regained access to his jacket and the firearm concealed in the pocket. Cf., State v. Robinson, 228 N.J. 529 (2017) (authority to frisk passenger cabin of detained vehicle dissipated when police neutralized the danger by securing the passengers and preventing them from re-entering the vehicle).

restraint exceeded the boundaries of an investigative detention under <u>Terry</u>. Defendant thus urges us to overturn the motion court's finding that he was not "in custody" for purposes of the <u>Miranda</u> rule.

In <u>State v. O'Neal</u>, our Supreme Court succinctly summarized the governing legal principles, explaining:

> In general, <u>Miranda</u> "warnings must be given before a suspect's statement made during custodial interrogation [may] be admitted in evidence." <u>Dickerson v. United States</u>, 530 U.S. 428, 431–32 (2000). In <u>Miranda</u>, <u>supra</u>, the Court defined "custodial interrogation" as questioning initiated by law enforcement "after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." 384 U.S. at 444. The determination whether a suspect is in "custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." <u>Stansbury v. California</u>, 511 U.S. 318, 323 (1994). That is, a police officer's "unarticulated plan has no bearing on the question whether a suspect was 'in custody' at a particular time; the only relevant inquiry is how a reasonable [person] in the suspect's position would have understood his situation." <u>Berkemer v. McCarty</u>, 468 U.S. 420, 442 (1984) (footnote omitted); <u>see</u> <u>State v. P.Z.</u>, 152 N.J. 86, 103 (1997) (noting that "critical determinant of custody is whether there has been a significant deprivation of the suspect's freedom of action based on the objective circumstances, including the time and place of the interrogation, the status of the interrogator, the status of the suspect, and other such factors") (citations omitted).

[190 N.J. 601, 615–16 (2007)].

In State v. P.Z., our Supreme Court also explained:

> Under federal law, the "ultimate inquiry is simply whether there is a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." California v. Beheler, 463 U.S. 1121, 1125 (1983) (internal quotation marks omitted). Our courts have also recognized that "custody in the Miranda sense does not necessitate a formal arrest, 'nor does it require physical restraint in a police station, nor the application of handcuffs, and may occur in a suspect's home or a public place other than a police station.'" State v. Lutz, 165 N.J. Super. 278, 285 (App. Div. 1979) (quoting State v. Godfrey, 131 N.J. Super. 168, 175, 329 A.2d 75 (App. Div. 1974)).

[152 N.J. at 102–03.]

In many—if not most—situations, handcuffing is consistent with a custodial arrest and signals to the suspect that he or she is in police custody in the Miranda sense. Cf. State v. Dickey, 152 N.J. 468, 483 (1998) ("Although not establishing the fact of an arrest, see United States v. Melendez-Garcia, 28 F.3d 1046, 1052 (10th Cir. 1994), the use of handcuffs heightened the degree of intrusion upon the liberty of the suspects."). In this instance, the motion court determined that defendant was not in custody for Miranda purposes despite being handcuffed. The judge reasoned that the handcuffs were used for officer

17

safety and to prevent further flight during what was expected to be a brief investigative detention.

The record suggests that notwithstanding the detective's assurance to defendant that he was not the subject of the investigation and would likely be released soon, defendant subjectively believed that he would be taken into custody.  Defendant all but guaranteed that outcome, moreover, by admitting that a gun was concealed in his jacket pocket.  As we have noted, and as the Supreme Court in O'Neal emphasized, we employ an objective test in determining whether a person is in custody for purposes of the general rule that a custodial interrogation must be prefaced by the administration of Miranda warnings.  O'Neal, 190 N.J. at 616 (quoting Stansbury, 511 U.S. at 323).  We need not decide, however, whether in these unusual circumstances a reasonable person in defendant's position would have understood the situation to be more than a temporary detention under the Terry doctrine.  Even assuming for the sake of argument that defendant was in custody for Miranda purposes, we believe this situation falls within the boundaries of the public/officer safety exception to the Miranda rule first announced by the United States Supreme Court in New York v. Quarles, 467 U.S. 649 (1984).

18

That narrow exception was embraced by our Supreme Court in O'Neal.

The Court explained:

> This case presents an opportunity to provide guidance concerning the safety exception to Miranda. That exception is based on the "objectively reasonable need to protect the police or the public from any immediate danger associated with the weapon." New York v. Quarles, 467 U.S. 649, 659 n.8 (1984). It is a narrow exception that "will be circumscribed by the exigency which justifies it." Id. at 658. Moreover, the United States Supreme Court expressed that "police officers can and will distinguish almost instinctively between questions necessary to secure their own safety or the safety of the public and questions designed solely to elicit testimonial evidence from a suspect." Id. at 658–59.
>
> [190 N.J. at 616–17].

The Court in O'Neal cited with approval cases from other jurisdictions that applied the public/officer safety exception to Miranda. The Court noted, for example, that in United States v. Shea, 150 F.3d 44 (1st Cir. 1998), the police arrested the defendant for his suspected role in an attempted robbery. Prior to giving Miranda warnings to the defendant in that case, one of the police officers asked if he had any weapons or needles on his person that could harm the officer. The United States Court of Appeals for the First Circuit concluded that the safety exception to Miranda applied in those circumstances. 190 N.J. at 617. Our

19

Supreme Court also cited to <u>United States v. Edwards</u>, 885 F.2d 377, 384 (7th Cir. 1989), which approved a police officer asking a drug dealer whether he had a weapon without first giving <u>Miranda</u> warnings. <u>Ibid.</u>

The Court in <u>O'Neal</u> concluded that in limited circumstances, "based on an 'objectively reasonable need to protect the police or the public from any immediate danger associated with the weapon[,]' a safety exception to <u>Miranda</u> is appropriate." <u>Id.</u> at 618 (citing <u>Quarles</u>, 467 U.S. at 659 n.8). The Court emphasized that to invoke this narrow exception to the <u>Miranda</u> rule, "the police must specifically frame the question to elicit a response concerning the possible presence of a weapon." <u>Ibid.</u>

In this instance, Detective DeVirgiliis' questions were narrowly tailored to address whether defendant had any weapons on or about his person. The detective's questions were not "designed solely to elicit testimonial evidence from a suspect." <u>Id.</u> at 617 (quoting <u>Quarles</u>, 467 U.S. at 658–59). Notably, the detective did not ask defendant why he ran when police announced their presence. We therefore hold that given the dangers posed to the pursuing officers by the chaos precipitated by flight into a residence where weapons might be stored, coupled with defendant's unusual behavior in voluntarily lying prone on the floor with outstretched arms, it was reasonable and lawful for the

20 <span>A-1966-18</span>

detective to ask defendant about the presence of weapons without first administering <u>Miranda</u> warnings.

IV.

Defendant further contends the trial court erred in admitting into evidence testimony regarding items that were seized from residence at 1237 Thurman Street pursuant to a search warrant that was sought and issued after defendant was arrested. Specifically, State Police seized two additional guns and various controlled dangerous substances. Defendant was not charged with possession of those items.

The trial judge first considered the admissibility of testimony concerning those items at a pretrial N.J.R.E. 104 hearing. The State acknowledged that "on their face, [the other items seized from the residence] may be unfairly prejudicial initially, but there are some circumstances which may be unforeseen to the parties at this time, which might make kind of this expanded relevance that would require them to be admitted at trial." At the State's request, the court reserved ruling on the issue.

During trial, defense counsel cross-examined Detective-Sergeant George Wren, the State Police member who served as the evidence custodian for the operation. Detective-Sergeant Wren had prepared an investigative report

21

documenting the evidence that was seized in connection with the warrant that authorized a search of the premises into which Bell and defendant fled. As we have noted that warrant was issued after the officers had found the gun in defendant's jacket pocket. In his role as evidence custodian for this operation, Detective-Sergeant Wren was given the firearm seized from defendant's jacket and entered it into the State Police evidence management system. The Detective-Sergeant's written report, however, only referred to the evidence seized pursuant to the search warrant. The report made no mention of the firearm and bullets that had been seized from defendant's jacket.

Defense counsel on cross-examination explored whether proper procedures were followed in handling and storing the firearm that had been seized from defendant. Counsel sought to ask the officer about the absence of information about this firearm in his report. That prompted a sidebar discussion at which the prosecutor argued that if counsel pursued that line of cross-examination, the State should be allowed on re-direct examination to rehabilitate the witness's credibility by posing questions about the contents of the report. The judge agreed with the prosecutor and expressly advised defense counsel that, "If you're going to question him about what's not in this report, then I'm going to let [the State] question about what's in that report."

22

Defense counsel proceeded to question the witness about the omission of information pertaining to the weapon recovered from defendant's jacket and, in accordance with the trial court's sidebar ruling, the State thereafter was allowed on re-direct examination to elicit testimony concerning the firearm and drugs that were found in the residence pursuant to the search warrant. The trial judge provided a limiting instruction to the jury regarding this testimony.[8]

We agree with the trial court that defense counsel opened the door to the contents of Detective-Sergeant Wren's report by challenging its completeness and the witness' credibility and professional competence based on the omission of information from that report. See State v. Prall, 231 N.J. 567, 582–83 (2018) (explaining that the "opening the door" doctrine of expanded relevancy allows a party "'to elicit otherwise inadmissible evidence when the opposing party has made unfair prejudicial use of related evidence.'") (quoting State v. James, 144 N.J. 538, 554 (1996)). The doctrine is designed "'to prevent a defendant from successfully excluding from the prosecution's case-in-chief inadmissible

---

[8] The limiting instruction was as follows: "Now you may recall during the course of Detective Sergeant Wren's testimony you heard testimony regarding the recovering and reporting of items other than the handgun that the defendant is charged with possessing. As I instructed you, you may not consider those other items when deliberating on the charges against [defendant], but you may consider them only for credibility purposes when considering the testimony of Detective [Sergeant] Wren."

evidence and then selectively introducing pieces of this evidence for the defendant's own advantage, without allowing the prosecution to place the evidence in its proper context.'" Id. at 583 (quoting James, 144 N.J. at 554).

After reviewing the entire record, we conclude the trial judge did not abuse his discretion in allowing the State to rehabilitate the evidence custodian with evidence relating to the thoroughness with which he prepared the report and complied with evidence handling procedures. It bears repeating that the judge gave a limiting instruction to the jury explaining how it was to consider this testimony. See State v. Herbert, 457 N.J. Super. 490, 503–04 (App. Div. 2019). In these circumstances, we do not believe the trial judge committed error, much less reversible error, especially considering the strength of the State's proofs that defendant knowingly possessed the firearm found in his jacket pocket. See R. 2:10-2 ("Any error or omission shall be disregarded by the appellate court unless it is of such nature as to have been clearly capable of producing an unjust result . . . .").

## V.

Defendant also contends the State violated his right to an impartial jury by exercising peremptory challenges to remove potential jurors because of their race. That discriminatory practice is strictly forbidden by Batson v. Kentucky

24

and State v. Gilmore. In Gilmore, our Supreme Court explained that if a defendant makes a prima facie case of purposeful discrimination, "the State must articulate 'clear and reasonably specific' explanations of its 'legitimate reasons' for exercising each of the peremptory challenges." 103 N.J. at 537 (internal citations omitted).

At the conclusion of the voir dire process, defense counsel objected to the State's use of peremptory challenges to remove two of the three African Americans on the panel. Defense counsel made clear that he objected to the removal of both minority jurors. The trial judge tacitly acknowledged that defendant had made a prima facie case of discrimination, thus requiring the prosecutor to offer a legitimate explanation.

The prosecutor provided a reasonably specific explanation for his decision to excuse one of the potential jurors, noting the juror was unable to recall the circumstances of her prior service as a petit juror. The prosecutor appeared to be poised to offer an explanation for peremptorily excusing the second minority juror but was interrupted by the court. The following exchange occurred:

> Prosecutor: That's part of my rationale. I don't think that, even if it was mistaken, it's still not race based. That's not sufficient. If you need more, --

The court: No. I'm satisfied that the state has provided at least a prima facie reasoning for [a] race neutral reason for striking . . .

Prosecutor: I'll provide one more, Your Honor, to ensure the sufficiency of the defense . . . . My point here is the same.

The court: Okay. I've already made my ruling.

The hearing ended on that note. It is not clear to us why the judge truncated the Batson/Gilmore hearing. Having tacitly ruled the defense met its initial burden under the Batson/Gilmore burden-shifting paradigm, the court was obligated to solicit and rule upon the prosecutor's reasons for challenging both minority jurors at the heart of defendant's motion. We reiterate that the rule as explained in Gilmore is that "the State must articulate 'clear and reasonably specific' explanations of its 'legitimate reasons' for exercising each of the peremptory challenges." 103 N.J. at 537 (emphasis added) (citations omitted).

We cannot overstate the importance of adhering to the rule that prohibits and deters the discriminatory use of peremptory juror challenges. We therefore are constrained to remand for the trial court to complete the hearing, at which the State must offer an explanation for its decision to challenge the second minority juror. If the court on remand determines that the prosecutor has failed to articulate a clear and reasonably specific explanation of its legitimate reasons

26

for challenging the second minority juror, the court shall vacate the convictions and order a new trial.

Finally, defendant contends the trial court imposed an excessive sentence. This contention lacks sufficient merit to warrant extensive discussion. R. 2:11-3(e)(2). Our review of sentencing determinations is limited and highly deferential. See State v. Pierce, 188 N.J. 155, 166–67 (2006); State v. Jarbath, 114 N.J. 394, 401 (1989).

The sentencing judge did not abuse his discretion in finding aggravating factors three, N.J.S.A. 2C:44-1(a)(3) ("The risk that the defendant will commit another offense"), six, N.J.S.A. 2C:44-1(a)(6) ("The extent of the defendant's prior criminal record and the seriousness of the offenses of which he has been convicted"), and nine, N.J.S.A. 2C:44-1(a)(9) (The need for deterring the defendant and others from violating the law"). Nor did the judge abuse his discretion in finding that no mitigating factors apply.

We note further that the court did not abuse its discretion in ordering that the present sentence be served consecutively to the thirteen-year sentence defendant is serving on his separate convictions for second-degree unlawful possession of a weapon, N.J.S.A. 2C:39-5(b)(1), second-degree certain persons

27

not to have a weapon, N.J.S.A. 2C:39-7(b)(1), third-degree hindering, N.J.S.A. 2C:29-3(b)(4), and fourth-degree resisting arrest, 2C:29-2(a)(2). See State v. Yarbough, 100 N.J. 627 (1985); N.J.S.A. 2C:44-5(a). We add that the sentencing court denied the State's motion for a discretionary extended term as a persistent offender under N.J.S.A. 2C:44-3(a), notwithstanding defendant's extensive criminal history, which includes eleven convictions for indictable crimes.

Accordingly, we conclude the judge dutifully followed the sentencing guidelines established by the Legislature and the case law; made findings with respect to the applicable aggravating and mitigating factors based on competent credible evidence in the record; and ultimately imposed a  sentence that was not "clearly unreasonable so as to shock the judicial conscience." See State v. Liepe, 239 N.J. 359, 371 (2019) (quoting State v. McGuire, 419 N.J. Super. 88, 158 (App. Div. 2011)).

## VII.

We remand for the sole purpose of requiring the court to complete the Batson/Gilmore hearing in accordance with section V of this opinion. In all other respects we affirm the conviction and sentence. We do not retain jurisdiction.

28

Affirmed in part and remanded in part for further proceedings consistent with this opinion.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-1966-18